## HARRY EDWARD BROCKMAN *v.* STATE OF MARYLAND

[No. 1137, September Term, 1974.]

*Decided July 29, 1975.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*Arnold M. Zerwitz, Assistant Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County, E. Garrison Neal, Assistant State's Attorney for Prince George's County,* and *Michael Patrick Whalen, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

From the facts elicited during the murder trial at which appellant, Harry Edward Brockman, was convicted by a jury in the Circuit Court for Prince George's County, or from the facts elicited during his plea-bargained deposition, it is clear that he committed one of the most heinous of crimes against

his fellow man—murder for hire. Regardless of the contempt in which such persons are held, democracy demands that throughout the prosecution its rules of fair play apply as well to them as to others. Whether the trial concludes with a determination of the defendant's guilt or innocence, the rigidity of the rules remains.

That Anglo-Saxon concept of procedural fair play, conceived initially to protect the innocent, has expanded to protect the admittedly guilty as well.

Even a guilty plea will not be accepted unless it is shown that the accused is fully aware of the consequences of his act, *Boykin v. Alabama*, 395 U. S. 238, that the accused was counseled, *Moore v. Michigan*, 355 U. S. 155 and that the State demonstrates on the record a strong factual basis for the plea. *McCall v. State*, 9 Md. App. 191, *cert. denied*, 258 Md. 729. It was but a short step to apply rules of fair play to plea negotiations, if not at the advent of that once questionable procedure, at least after it had become socially respectable. The Supreme Court, the Court of Appeals and this Court have all required the imprimatur of fair play in consummated plea bargains. *Santobello v. New York*, 404 U. S. 257; *Miller v. State*, 272 Md. 249; *Wynn v. State*, 22 Md. App. 165.

One difficulty inherent in the plea negotiation process is determining the point at which the bargain is so complete that the parties cannot withdraw — the point of no return. Clearly at *no* point prior to the entry of the plea can the accused be compelled to perform specifically, *i.e.*, to plead guilty. The bargain must thus be slightly one-sided since reason tells us the State may not always so freely withdraw; although, we have decided that under proper circumstances the State may, indeed should, abrogate the agreement:

> "If prior to the consummation of a plea bargain he foresees that it might endanger society, he has not merely the right, but the responsibility, to withdraw from the agreement." *Wynn*, 22 Md. App. at 172.

We have not heretofore dealt with circumstances where the State was bound by its offer. In the case at bar the State attempted to withdraw from a bargain made, and we must now consider whether that decision was allowable.

## The Facts

Appellant and a co-defendant were being tried for the murder of Gerald Godbout, Jr. whom appellant shot while the victim was in his automobile, although the intended victim was not Mr. Godbout, but a female occupant of the vehicle. Appellant explained that "A contract to dispose or murder Mrs. Ward, who was with Mr. Godbout, had been taken and it was [being] executed at that time."

A day and a half after the trial had begun and one or two witnesses had been heard, a renewed effort at plea negotiations was made. It was apparent that the State was anxious to obtain evidence against the person who negotiated, but did not execute, the contract. Appellant's attorney explained [1] that:

> "On the second day, I believe, the 9th of July, as a result of multiple conferences with Mr. Neal, [the Assistant State's Attorney] the other attorney, myself and Judge Parker, an offer was made by the State, which offer was as follows: If both de- fendants pled to second degree murder the State would drop the first degree charge and all re- maining counts of that indictment. In exchange for that the State would recommend to the judge that for the second degree conviction that no more than ten years be the sentence. For a — in exchange of that plea bargaining each defendant was to give a full statement to the State by way of a sworn deposition and, in addition, was to testify before the grand jury. An explanation: At that time the

---

1. The facts relating to the plea negotiations were elicited under oath from the Assistant State's Attorney and the District Public Defender assigned to represent appellant. While each subjected the other to vigorous cross-examination, their testimony was not materially divergent factually.

State felt that Mr. Maness [the co-defendant] and
Mr. Brockman were the individuals that, in fact,
killed Mr. Godbout [the actual though unintended
victim] but that they, the defendants, were, quote,
put up to it by a Mr. Ward, who was the husband of
the [intended] victim, Mrs. Ward.

Now, after considerable discussions at which
Judge Parker was present, and it took place over
many hours in chambers, the State agreed to that
and we talked to our respective clients. Mr. Maness
accepted the offer. I then advised Mr. Neal and
Judge Parker that it was the decision of Mr.
Brockman at that time to refuse it."

With one of two defendants about to plead guilty the court
recessed for the day. After consultation with counsel,
appellant overnight changed his mind and the following day
agreed to accept the offer as had his co-defendant.

"At no time previous to this did Mr. Neal indicate
to me or in my presence that this deal must be
accepted immediately. I had advised them it was
not accepted, that Mr. Brockman wanted to think
about it overnight. There was no time element put
on this offer."

Appellant's co-defendant, Mr. Maness, had in the meantime
fulfilled his part of the bargain by testifying for the State
before the grand jury. The State was thus reluctant to
continue to hold appellant's offer open and contended

". . . that Mr. Brockman had turned down the
offer to enter a plea of guilty to second degree
murder, that there was no need, in my mind, for
the State to accept the plea to second degree
murder, based on the evidence that we received
from Mr. Maness, and we were able to corroborate
as a result of the search warrant that evening."

As a consequence of appellant's change of heart, he urged
the State to avail him of the offer. The negotiations were

concluded in the chambers of the judge — who presumably participated to some degree. Appellant's attorney indicated that:

> ". . . there was an encouragement on the part of Judge Parker, in our presence, to the State to go ahead with the deal."

The State was more specific:

> "A Yes. I recall him indicating we were probably going to be trying this case for the next twenty years in the State and Federal Courts if prosecuted."

For whatever the reason the State:

> "Somewhat reluctantly, but nevertheless in agreement, did agree to take the second degree plea."

There was little faith evident between the contracting parties. The atmosphere apparent from the record was that of suspicious adversaries approaching each other as if on eggshells. A cautious cooperation prevailed because of this mutual distrust.

> "Mr. Brockman had indicated to me that he, in some respects, distrusted Mr. Neal and had reservations about giving a statement for he was fearful that in giving a statement that there would be some waiver on Mr. Neal's part."

The State, on the other hand, revealed its own suspicions when it expressed its reservation during appellant's deposition:

> "Over quite some period of time I felt Mr. Brockman was at least parrying with me and was not being straightforward with his answers . . . ."

Our own review of that deposition does not accord with the State's conclusion. We found the answers elicited to be direct, detailed, complete, without equivocation and totally

688

inculpatory, with but one exception. That exception concluded the deposition and brought about this ground for appeal. Appellant was asked to identify a picture of the man the State believed had negotiated the murder contract. The public defender described the scene.

"The picture was handed to Mr. Brockman, who looked at it for a significant period of time, enough time that I was starting to wonder why the delay and what was going through his mind. Mr. Brockman then said — when he was asked if he knew who that picture was of he said, 'No.' Mr. Neal hesitated, as I recall. I don't know if he showed him another picture of Ward or not, but it turned out that was a picture of Ward.

There was — then Mr. Brockman leaned over to me shortly thereafter, because I knew something was wrong, and said to me, 'That was Mr. Ward, but he's trying to trick me with just one; he's showing me one photo and he's trying to trick me and I know that if I don't testify at Mr. Ward's trial that this plea bargaining deal won't go down, and I feel that Mr. Neal is trying to trick me and affect my testimony so bad that it won't be accepted by the Court.' In other words, it would be tainted by the single-photo lineup. And so tainted, as Brockman indicated to me, he would not be allowed to testify, would have no use and would be forced to trial thereafter.

- I explained to Mr. Brockman later on that I agreed with him, that the one-photo spread tainted the case, but that would have nothing to do with the deal. We then offered to Mr. Neal to continue the deposition. Mr. Neal indicated words to the effect, 'That's it. The man has committed perjury. There's no deal. Everything is off.' There were a few words exchanged between Mr. Neal and myself and Mr. Marshall [the State's Attorney who was presumably present] that were not on the record as

to my disagreement with what the understanding was."

## The Law

The renunciation of the plea bargain by the State elicited from appellant a Motion for Appropriate Relief praying what amounted to specific performance of the bargain. Finding that the *Santobello, Miller, Wynn* trilogy (all *supra*) was not apposite because the agreement was "in the executory stage," the judge said that there was nothing:

". . . from my reading of the Miller case or Wynn case or Santobello case, that says the State must go through with a plea bargaining prior to the time of the acceptance of the plea."

Restricting those cases to their factual contexts that conclusion may be reached; however, by dicta as well as by logical extension of the principles involved, it is apparent that no such cut and dry limitation was intended. For instance, we recently extended that "trilogy" to apply to "a negotiated plea of not guilty and trial upon a factual stipulation" in *Sturgis v. State*, 25 Md. App. 628, 336 A. 2d 803.

The principle underlying each of these cases dealing with plea negotiations was that

"This procedure to dispose of criminal charges presupposes fairness." *Wynn*, 22 Md. App. at 171; *See Santobello*, 404 U. S. at 261.

Fairness is not limited to that which follows acceptance of a negotiated plea but includes the circumstance preceding it as well. Even further, it is of little consequence whether *un*fairness comes to pass because the State is motivated by ill-will or by the best and most charitable of motives.

## The Holding

We think it was manifestly unfair for the prosecutor to depose an accused pursuant to an agreement for limited prosecution, elicit from him every fact and detail necessary

to reconstruct the crime, request of him a photographic identification which arguably could taint subsequent in-court identification, then — having aroused suspicion and distrust in the accused — renounce the bargain because of an equivocal identification of a man appellant had once seen. Unfair though it may have seemed, that sequence of events does not alone compel our reversal, although it sets the stage. Crucially important here is the paper thin basis on which the State claimed the accused had perjured himself and destroyed his credibility as a witness, when compared with this defendant's having moved irremediably and prejudicially to his detriment by way of a wholly inculpatory deposition.[2]

---

2. The deposed testimony renounced was:

"Q   And was there any discussion in December of '70 or January of '71 regarding the possible murder of Dorothy Mae Ward?

A   No, sir, there was not. I was not even introduced to Mr. Ward at that time. I was never told his name at that time.

Q   Showing you what has previously been marked 2 and 3 for purposes of this hearing, and ask you if you can recognize that person?

A   No, sir, I do not.

Q   You do not?

A   No, sir.

MR. NEAL: For the record, State's Exhibits 2 and 3 for purposes of this record are photographs of one James Edward Ward, of 5409 — 14th Avenue, Hyattsville, Maryland."

After several unrelated questions appellant asked to confer with his counsel off record after which the deposing by the State resumed to conclusion.

"Q   On the record. Showing you State's Exhibit No. 2 and 3 — showing you State's Exhibits 2 and 3, do you have any further comment to make about those two exhibits?

A   Yes, sir. They are the pictures of Mr. Ward. They are at least pictures of the gentleman I saw at Jesse Stephens' in December or January — early January of '71.

Q   You previously indicated you couldn't identify those photographs, is that correct?

A   Yes, sir, that is true. It does not appear to me that my testimony would be worth anything. It did not appear at the moment when the pictures were placed in front of me that I had any position with the State with regard to my cooperation if I were to identify him at this time and at the trial.

MR. NEAL: I'm going to break for a minute.

(Short recess).

BY MR. NEAL:

Q   I just walked down the hallway thinking in view of what we

Nor is it enough surcease of appellant's prejudice in the instant case that the judge below sealed all copies of the deposition available to him, including two that were used to obtain search warrants. In doing so the judge explained:

"THE COURT: Well, the intent of the sealing of what I have under my control is a carrying out of that portion of the plea bargaining agreement. It shall not be used in any way, shape or form, and at any time, Mr. Camus, you would feel that any information is coming into this trial that has been gleaned from that statement or the search warrant you appropriately object and I assure you the Court will sustain it." [3]

Clearly the sealing of the deposition and the offer to preclude objectionable evidence is an impractical and

said when we started this case there wasn't going to be any misrepresentation of facts for any reason whatsoever. In view of the fact you have already misrepresented the facts here I don't know whether to believe you or not. But I don't have any faith in your credibility.

I think that we have wasted our time for the reason you materially misrepresented the fact you did not know James Edward Ward. It's my understanding this cannot be used against you, but I can not accept the responsibility in my own heart and my duty as an assistant State's Attorney, responsibility for putting you on the stand and proffering your credibility to a jury. I tried to make that very clear to you before we started.

I think it's — there's no thinking to it. Based on the fact you misrepresented a very material fact already in this statement I cannot go forward with the plea that was offered to me. And that's going to be my decision in this case. I'm sorry it happened that way. I thought that you were prepared to be candid. But you just admitted lying under oath, and that was the purpose for coming up here, and I can't go forward with it.

A   Well, I could not, Mr. Neal, state absolutely that was Mr. Ward, because I did not know it was Mr. Ward at the time I saw him. And inasmuch as my plea is based on my testimony at the trial I thought I was being given an illegal lineup, a picture placed in front of me to incriminate one person. To identify him there with one picture would have influenced my testimony at trial."

3. The State's comment at the time indicates its possible if not probable continued "supping on the milk" of the cow it sold, then took back; Wynn, 22 Md. App. at 173:

"MR. NEAL: Just one point of clarification. It probably will have to be used in the trial of Mr. Ward."

unenforceable· remedy when we consider the unlimited subtle uses to which a prosecutor may put the knowledge gained from appellant's detailed reconstruction of a crime. Here there was a witness nearby who, while not having seen the shooting, heard the shots and immediately thereafter saw appellant running. The deposition confirmed every detail supporting the State's case including the witness's location and presence. With the facts thus verified, circumstantial reconstruction of the facts before a jury was obviously most convincing. Yet to what precisely can appellant point with an evidentiary objection? As the trial judge concluded though for other purpose, the State had been

> ". . . on a fishing expedition to determine exactly what it was that Mr. Brockman knew about the case, and up to then it's rather apparent there was no disclosure of any facts by the defense to the State's Attorney."

We hold that appellant's transgression was minor while he was prejudiced beyond redemption once the State was persuaded to interrupt the trial and to proceed, albeit reluctantly, with the bargain. The court's efforts to protect the appellant and absolve the State fell short of either goal. The sealed deposition was inadequate protection and that judicial absolution provided no remission to the State.

Anticipating that which has occurred here, we said in *Wynn,* 22 Md. App. at 172:

> "We cannot overlook the fact that a prosecutor has a profound obligation to society. If *prior to the consummation* of a plea bargain he foresees that it might endanger society, he has not merely the right, but the responsibility, to withdraw from the agreement. *Plea bargains should not be specifically enforced in the absence of affirmative evidence of prejudice arising from the bargain, which prejudice cannot be remedied by permitting the defendant to withdraw his plea and commence anew. Only upon*

> *a finding of such inexpiable prejudice should a
> defendant be permitted the option of specific
> performance by the trial court,* and even then a full
> record should be made anticipating the possibility
> of appellate review." [Emphasis added].

The prejudice here is clear from the record which contains the deposition.

We should note that the State's attempt at rescission does not appear so much as "bad faith," as it was "bad timing." The prosecutor's recognition of his "obligation to society," appears to have come during his hallway meditation just before concluding the deposition. "All foreseeable consequences" of [the] plea bargain should have been considered by counsel *before* the initial offer was made identically to *both* defendants. Even at that point, as we indicated in *Wynn,* the prosecutor was not bound (as may have been so in contract law) by the mere acceptance of the offer. It was the State's passively permitting, if not overtly leading appellant to a position of prejudice that foreclosed the option of turning back. That error of judgment was compounded by the participation and influence of the court in the decision.[4]

The bargain to be struck is perforce limited to the prosecutor and the defendant, otherwise how can the court maintain the position that it is not bound by the sentencing aspects of the bargain. Here for example the bargain was to agree to a plea of guilty to second degree murder with a recommendation for a ten year sentence. A sentencing recommendation in a proper context is just that — a recommendation. It is one of many factors the court considers in carrying out the sentencing process over which it has "wide discretion" restricted only by "statutory limitations." *Bartholomey v. State,* 267 Md. 175, 193-194. Thus the court could ignore the recommendation and give the maximum 30 years if it so chose. Md. Code, Art. 27, Sec.

---

**4.** Both attorneys testified to some degree of influence by the judge whose expressions of opinion and participation in plea negotiations are of questionable propriety at best.

414. Court participation in negotiations between prosecutor and defendant, however, impinges on subsequent free exercise of that sentencing responsibility.

## The Remedy

In seeking the "ultimate remedy" we are guided by *Miller, supra.* There the Court obviously followed the remedy expressed in Mr. Justice Douglas' concurring opinion in *Santobello,* permitting appellant to elect. Since the trial has been had his election is limited to the result obtained thereby or the fulfillment of his initial bargain and guilty plea to murder in the second degree. As pointed out, if he chooses the latter the State must comply with its recommendation, but the court is not bound thereby in passing sentence. In expressing his election on remand it follows that appellant must also dismiss this appeal as it pertains to the other questions raised at the trial and which we have here left unanswered. If he elects to stand by the trial he has had, the record will be returned for our review of those unanswered issues but he must on the record waive the benefits of his bargain. As we said in *Wynn,* 22 Md. App. at 173, while

> "The State may not sell the cow and continue to sup upon her milk,"

neither may the appellant.

*The case is remanded for further proceedings in accordance with this opinion.*