# STATE OF MARYLAND *v.* BROCKMAN

[No. 93, September Term, 1975.]

*Decided May 21, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Arnold M. Zerwitz, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court. Murphy, C. J., dissents and filed a dissenting opinion at page 700 *infra.*

The appeal in this criminal cause concerns a plea bargain the terms of which were that the accused would provide the State with information and testimony concerning a murder in which he and others had participated, and that in return the prosecution would allow the defendant to plead guilty to a lesser offense. Asserting that the defendant-respondent Harry Edward Brockman had failed to fulfill his part of the bargain, the State repudiated the agreement before the defendant entered the contemplated confession of guilt. Brockman denies failing to honor his obligations and asks that we hold the State of Maryland to its promise. As we conclude that the accused's misstep amounted to no more than an inconsequential hesitation insufficient to nullify the

understanding, and because we think it would be inequitable and unjust to the defendant as well as prejudicial to the administration of this State's criminal justice system to permit the prosecution to disavow this agreement, we shall allow Brockman to choose between the results of his already completed trial and the fulfillment of his plea bargain.

The facts are neither complicated nor in dispute. At the fountainhead of this case is a contract to commit murder. James Edward Ward, through an intermediary, hired Brockman and David Victor Maness to kill both Ward's wife and her friend, Gerald Godbout, Jr., the person they in fact murdered on April 28, 1972. Brockman and Maness were apprehended and, on June 6 of that year, indicted for premeditated murder, possession of a handgun, and the use of a handgun in the commission of a crime of violence. After a number of lengthy delays, the reasons for which are not relevant here, their trial was scheduled to commence on July 8, 1974. It was on that day, after the joint trial of Brockman and Maness had begun, that the codefendants and the State first entered into plea negotiations. The prosecutor, in an effort to reach the initiator of the murder plan, made Brockman and Maness the following tempting offer: the State would accept pleas of guilty to murder in the second degree, recommend to the court a sentence of no more than ten years and *nolle pros* all other counts in their indictment; in exchange, Brockman and Maness were to provide the State with sworn depositions as well as testify both before the grand jury and at the trial of the author of the murder scheme. Maness agreed to this bargain posthaste and that very day gave the State a deposition which incriminated Ward, Brockman and himself. Brockman, however, declined at that time to accept the State's offer, but, perhaps as a result of sensing the strength of the Government's case and thus seeing the handwriting on the wall, agreed to do so the following day, July 9. At that point, because it had received such complete information from Maness, the State was disinclined to deal further with Brockman. Nonetheless, after a conference with the trial judge, the prosecution reluctantly reextended the offer and Brockman accepted.

In furtherance of the understanding, and while the trial was in recess, Brockman was deposed in the office of the State's Attorney. Although, as the Assistant Attorney General noted at oral argument before this Court, "the parties [were] sparring with each other, [as] Brockman did not trust the State [and] the State did not trust Brockman," the defendant answered questions for over an hour and completely incriminated Ward and Maness as well as himself. The Assistant State's Attorney conducting the deposition, Mr. Neal, then removed two photographs of Mr. Ward from a stack and presented one or both (the record is not clear as to the number) to Brockman, asking him if he recognized the person pictured. Mr. Camus, the Assistant Public Defender representing the deponent, described what then occurred:

> "The picture was handed to Mr. Brockman, who looked at it for a significant period of time, enough time that I was starting to wonder why the delay and what was going through his mind. Mr. Brockman then said — when he was asked if he knew who that picture was of he said, 'No.' Mr. Neal hesitated, as I recall. I don't know if he showed him another picture of Ward or not, but it turned out that was a picture of Ward.
>
> "There was — then Mr. Brockman leaned over to me shortly thereafter, because I knew something was wrong, and said to me, 'That was Mr. Ward, but he's trying to trick me with just one; he's showing me one photo and he's trying to trick me and I know that if I don't testify at Mr. Ward's trial that this plea bargaining deal won't go down, and I feel that Mr. Neal is trying to trick me and affect my testimony so bad that it won't be accepted by the Court.' In other words, it would be tainted by the single-photo lineup. And so tainted, as Brockman indicated to me, he would not be allowed to testify, would have no use and would be forced to trial thereafter.

[(The taking of the deposition was recessed and, with Mr. Neal out of the room, Mr. Camus and his client conferred.)]

"I explained to Mr. Brockman . . . that I agreed with him, that the one-photo spread tainted the case, but that would have nothing to do with the deal. We then offered to Mr. Neal to continue the deposition."

The deposition was then resumed, with the transcript reading as follows:

"Q. [(Mr. Neal)]: On the record. Showing you [the same photographs], do you have any further comment to make about those two exhibits?

A. [(Mr. Brockman)]: Yes, sir. They are the pictures of Mr. Ward. They are at least pictures of the gentlemen I saw at [the intermediary's house] in December or January — early January of '71.

Q. You previously indicated you couldn't identify those photographs, is that correct?

A. Yes, sir, that is true. It does not appear to me that my testimony would be worth anything. It did not appear at the moment when the pictures were placed in front of me that I had any position with the State with regard to my cooperation if I were to identify him at this time and at the trial.

Mr. Neal: I'm going to break for a minute. (Short recess)."

When the Assistant State's Attorney returned, he first told the defendant that "[i]n view of the fact you have already misrepresented the facts here I don't know whether to believe you or not"; shortly thereafter he announced, "[t]his man has committed perjury. . . . There is no deal. . . . Everything is off." Although Brockman protested that he had been entirely truthful and desired to complete the deposition at the time, Mr. Neal indicated that the depo-

nent's action had rendered the agreement null and void and declined to continue.[1]

Brockman's trial was thereafter resumed, but, for reasons not relevant here, ended in a mistrial. Before being retried, the defendant filed a "Motion for Appropriate Relief (For Specific Performance of Agreement Between the State and the Defendant)," which was denied, the trial judge holding that Brockman had violated the compact. At his retrial before a jury in the Circuit Court for Prince George's County (Robert B. Mathias, J.), the defendant was found guilty of murder in the first degree as well as of two handgun offenses, and was sentenced to life imprisonment plus eight years. On appeal, the Court of Special Appeals vacated the judgment and remanded the case to the trial court, directing that Brockman be permitted to elect between the result of his trial and enforcement of the agreement. *Brockman v. State*, 27 Md. App. 682, 694, 341 A. 2d 849 (1975). We granted certiorari to examine the propriety of this action; finding no error, we shall affirm the judgment of the Court of Special Appeals.

We begin our analysis of the law by considering the role plea bargains now play in the administration of both this State's and the nation's criminal justice systems.[2] The sim-

---

1. Since it considered the plea bargain cancelled, the prosecution never requested the defendant to appear before the grand jury or to testify at Ward's trial; the State, however, admits that if it had still been willing to consummate the agreement, Brockman "probably" would have fulfilled the remainder of his obligations.

2. Plea bargaining is not of recent vintage. It appears to have originated in seventeenth century England as a means of mitigating unduly harsh punishments. Note, *Plea Bargaining — Justice Off the Record,* 9 Washburn L.J. 430, 432 (1970). Sir James Stephens, in his *Criminal Procedure, From the Thirteenth to the Eighteenth Century, 2 Select Essays in Anglo-American Legal History* 485 (1908), provides the following description of early English plea bargaining:

"If a person accused of any crime, but especially of robbery, chose to plead guilty and to offer to give up his accomplices he was handed over to the coroner, before whom he confessed his guilt and accused a certain number of other persons, and the king might 'grant him life and limb if he would deliver the country from a certain number of malefactors either by his body' (i.e. by killing them upon battle waged) 'or by the country' (i.e. convicting them before a jury), 'or by flight.' If he failed to fulfil the conditions imposed on him he was hanged on his own confession."

*See generally J. Bond, Plea Bargaining and Guilty Pleas* § 1.07[1] (1975).

ple fact is that today plea agreements account for the disposition of an overwhelming percentage of all criminal cases. *See J. Bond, Plea Bargaining and Guilty Pleas* §§ 1.02, 1.03, 1.07[2] (1975); 5 Sw. U.L. Rev. 214, 215 & nn. 7, 8 (1973). If this were not so, but rather every case entailed a full-scale trial, state and federal courts would be flooded, and court facilities as well as personnel would have to be multiplied many times over to handle the increased burden. *Santobello v. New York,* 404 U. S. 257, 260, 92 S. Ct. 495, 498, 30 L.Ed.2d 427 (1971). These agreements, however, also serve other needs besides preventing, or at least relieving, the overcrowding of our courts. As the Supreme Court of the United States noted in *Santobello, id.* at 261, 92 S. Ct. at 498, the termination of charges after plea negotiations

> "leads to [the] prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned."

Additionally, plea agreements eliminate many of the risks, uncertainties and practical burdens of trial, permit the judiciary and prosecution to concentrate their resources on those cases in which they are most needed, and further law enforcement by permitting the State to exchange leniency for information and assistance. *See Brady v. United States,* 397 U. S. 742, 752, 90 S. Ct. 1463, 1471, 25 L.Ed.2d 747 (1970); *People v. Selikoff,* 35 N.Y.2d 227, 318 N.E.2d 784, 788-89, 360 N.Y.S.2d 623 (1974), *cert. denied,* 419 U. S. 1122 (1975). All in all, it is our view that plea bargains, when properly utilized, aid the administration of justice and, within reason, should be encouraged.

It is, of course, no longer open to question that plea agreements are at times entitled to judicial enforcement. In *Santobello v. New York, supra,* 404 U. S. at 262, 92 S. Ct. at 499, Chief Justice Burger, for the Supreme Court, said quite plainly that

> "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."

Furthermore, this Court, in *Miller v. State,* 272 Md. 249, 253-55, 322 A. 2d 527 (1974), recently held that when a defendant's guilty plea rests in part on the prosecution's promise not to make any recommendation as to sentencing or disposition, and the State violates its word, the accused may obtain redress by electing either to have his guilty plea vacated or to leave it standing and have the agreement enforced at resentencing. *See also Sturgis v. State,* 25 Md. App. 628, 336 A. 2d 803 (1975) (where State's promise to make no recommendation on sentence in return for court trial on agreed facts was held to be enforceable). Other state and federal courts have also enforced plea bargains. *See, e.g., United States v. Carter,* 454 F. 2d 426 (4th Cir. 1972) (en banc), *cert. denied,* 417 U.S. 933 (1974) (government promise of no future prosecutions arising out of certain transactions); *State v. Thomas,* 61 N. J. 314, 294 A. 2d 57 (1972) (guilty plea to assault pursuant to agreement held to bar subsequent murder charges).[3] However, *Santobello, Miller,* and almost all of the other reported cases dealing with the question have arisen in situations where the prosecutor, *after* the entry of a guilty plea by the defendant, took some course of action inconsistent with what the accused claimed the government agreed to do in exchange for the plea. In contrast, in the present case the defendant

---

**3.** Even prior to *Santobello,* courts utilized principles of equity and fair play to protect defendants from prosecutorial overreaching in the plea bargaining context. *See* United States v. Paiva, 294 F. Supp. 742 (D.D.C. 1969); Courtney v. State, 341 P. 2d 610 (Okla. Crim. 1959); *cf.* People v. Delles, 69 Cal. 2d 906, 447 P. 2d 629, 73 Cal. Rptr. 389 (1968) (judge's promise to grant probation).

did not plead guilty to any charge, but instead stood trial because, *prior* to the time he was to be afforded the opportunity to confess guilt, the State refused to carry out its part of the bargain.

The only case we have discovered involving the withdrawal by the State from a plea bargain *prior* to the accused's entry of an agreed guilty plea is a recent decision of the Supreme Court of Iowa, *State v. Kuchenreuther*, 218 N.W.2d 621 (Iowa 1974). The defendant in that case, having participated in a theft of money from a service station, executed a written agreement whereby, in exchange for his promise to plead guilty to disturbing the peace and make restitution as well as provide information on all other criminal activities of which he was aware, the prosecutor agreed to grant Kuchenreuther immunity from prosecution for all other crimes he may have previously committed. *Id.* at 622. In furtherance of this agreement, Kuchenreuther returned the money taken and cooperated with the State, but was not afforded an opportunity to confess guilt to disturbing the peace. Rather, he was charged with larceny in the nighttime and, following the trial court's ruling that the plea bargain was of no legal force or effect, found guilty of that offense. *Id.* at 623. On appeal, the Supreme Court of Iowa reversed the larceny conviction, stating that were it allowed to stand it "would unduly undermine our system of justice." *Id.* The court added:

> "Apparently the county attorney entered into the instantly involved plea bargain and attendant agreement in all good faith but for some reason changed his mind while en route to the court house. In any event the bargain made was breached by the State. Under existing circumstances such is nothing less than an intolerable violation of our time-honored fair play norm, and accepted professional standards." *Id.* at 624.

We agree with the Iowa court that a defendant may sometimes be entitled to enforcement of his plea bargain even though he has not yet entered the confession of guilt he

promised to make. However, the State contends that for several reasons, none of which were advanced in *Kuchenreuther*, Brockman cannot do so.

The State's first and primary argument in this regard is that Brockman cannot enforce the agreement because he himself violated it; specifically, the Government contends that the defendant failed to give a complete and truthful deposition, since he initially failed to identify the two photographs as being of Mr. Ward. We, however, think that Brockman's initial statement that he did not recognize the person in the two pictures was, under the circumstances, a de minimis infraction of his obligations, if a violation at all, and thus insufficient to void the understanding. It must be remembered that Brockman, in accordance with the terms of the understanding, answered questions for over an hour, during which time he not only completely and totally incriminated himself but also, as the State had hoped, implicated Ward in the contract murder scheme. It was only then that Brockman made his misstep of denying that he knew the man pictured in the two photographs. And considering the defendant's reason for making the denial, it appears that rather than attempting to deprive the State of its due, he was trying to ensure that he would be able to fulfill his key obligation — testifying at Ward's trial. In view of the admitted mistrust and suspicion between the parties, and the plausible basis for the defendant's concern that if he named the person pictured in the photographs as Ward it would be a tainted identification, *see, Simmons v. United States*, 390 U. S. 377, 382-84, 88 S. Ct. 967, 970-71, 19 L.Ed.2d 1247 (1968), we cannot say Brockman's fear was irrational. Finally, right after his attorney informed him that the plea agreement would stand even if the State's procedure made Brockman's identification of Ward inadmissible, the defendant did testify that Ward was the person in the two photographs and did offer to finish the deposition. Viewed in this context, we think Brockman's assertion that he could not identify the man in the two photographs, which statement he quickly retracted following  brief conference with his counsel, was inconsequential and thus insufficient

to justify the State in taking the extreme step of cancelling the plea bargain.[4] We note that the standard to be applied to plea negotiations is one of fair play and equity under the facts and circumstances of the case, which, although entailing certain contract concepts, is to be distinguished from what the State appears to advocate, the strict application of the common law principles of contracts. *See Santobello v. New York, supra,* 404 U. S. at 261, 92 S. Ct. at 498; *State v. Kuchenreuther, supra,* 218 N.W.2d at 624; *People v. Selikoff, supra,* 318 N.E.2d at 791-92; Note, *The Legitimation of Plea Bargaining: Remedies for Broken Promises,* 11 Am. Crim. L. Rev. 771, 790-92 (1973). The rigid application of contract law to plea negotiations would be incongruous since, for example, the trial court is not ordinarily bound by the compact and, as the State concedes, it cannot obtain "specific performance" of a defendant's promise to plead guilty. *Cf. People v. Selikoff, supra,* 318 N.E.2d at 791-92.

The State next contends that, regardless of whether the accused failed to fulfill his obligations, the prosecutor has the right, and sometimes the duty, to rescind a plea bargain prior to entry of a guilty plea if the defendant would not be prejudiced. Further, the prosecution asserts, Brockman endured no prejudice because his deposition was sealed by the court and not used at his trial, *cf. Mobley ex rel. Ross v. Meek,* 531 F. 2d 924 (8th Cir. 1976),[5] and also because the information he supplied was merely cumulative

---

4. Of course, there may be situations in which the State may refuse to abide by a bargain it has entered, where, for example, a defendant fails to cooperate sufficiently or materially misrepresents the facts in his testimony. An illustration of such circumstances appears in United States v. Boulier, 359 F. Supp. 165, 169 (E.D. N.Y. 1972), *aff'd sub nom.* United States v. Nathan, 476 F. 2d 456 (2d Cir.), *cert. denied,* 414 U. S. 823 (1973), where the court refused to compel enforcement of a plea bargain following the accused's blatant and consistent refusal to provide promised information. We think, however, that the present case is by far more akin to United States v. Paiva, *supra,* 294 F. Supp. at 748, wherein it was determined that the government's argument — that Paiva did not abide by the agreement by "hedging" on the identification of bonds he had forged — was contradicted by the testimony.

5. The State analogizes this to the situation wherein a defendant provides the prosecution with a complete confession, but the confession is excluded from trial due to noncompliance with the dictates of Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966); in neither case, the State asserts, can the defendant justifiably complain of prejudice.

of all the State had previously learned from Maness. As support for its position, the State principally relies on the following passage penned by Judge Lowe for the Court of Special Appeals in *Wynn v. State,* 22 Md. App. 165, 172, 322 A. 2d 564 (1974), an opinion filed seven days prior to our decision in *Miller:*

> "We cannot overlook the fact that a prosecutor has a profound obligation to society. If prior to the consummation of a plea bargain he foresees that it might endanger society, he has not merely the right, but the responsibility, to withdraw from the agreement. Plea bargains should not be specifically enforced in the absence of affirmative evidence of prejudice arising from the bargain, which prejudice cannot be remedied by permitting the defendant to withdraw his plea and commence anew. Only upon a finding of such inexpiable prejudice should a defendant be permitted the option of specific performance by the trial court, and even then a full record should be made anticipating the possibility of appellate review."

We, however, are not in full accord with this statement from *Wynn* for it overlooks a significant consideration, the importance of plea bargains to our criminal justice system. The incidence and utility of such agreements has already been noted in this opinion and need not be repeated. We think that when a plea bargain has been agreed to by both a proper representative of the State and a defendant, and is not in violation of any law or public policy of this State, it would be a grave error to permit the prosecution to repudiate its promises in a situation in which it would not be fair and equitable to allow the State to do so. *Cf. State v. Kuchenreuther, supra,* 218 N.W.2d at 623. And as we see it, fairness and equity require that the State be held to its bargain if the defendant has to a substantial degree and in a proper manner performed his obligations, and is willing, but because of some action taken by the prosecution is unable, to

fulfill the remainder of his promises. Applying this principle to the case before us, and remembering that we have already dismissed Brockman's misstep as inconsequential, we conclude that when the defendant gave the State his deposition, in which he not only totally incriminated himself but also provided the prosecution with every fact and detail of the murder, he properly performed his obligation to a substantial degree. Additionally, when the State abruptly ended the taking of Brockman's deposition, he offered to finish it. With respect to the defendant's promise to testify against Ward both before the grand jury and at Ward's trial (which pledge he may not be able to fulfill since Ward has apparently already been tried without the aid of Brockman's testimony), we conclude the State cannot complain because it admits that if it had been willing to complete its side of the bargain, the defendant "probably" would also have done so. Finally, we note that in order for the defendant to take advantage of his plea agreement, he must still plead guilty to murder in the second degree when provided that chance by the State. We hold that under these circumstances the State may not now disavow its understanding with Brockman. Having made this decision, we need not and do not reach the question of what part prejudice to the accused plays in determining whether the prosecution may cancel a plea bargain.

Finally, we deal with the State's suggestion that Brockman is now without a remedy since he entered a plea of not guilty and was afforded a jury trial which safeguarded all of his constitutional rights. We find this an untenable proposition considering the accused's plight, particularly since this Court's holding in *Miller* suggests otherwise. In that case, speaking through Judge Eldridge, we voiced our belief that when an agreement is violated after the entry of a guilty plea the defendant should be permitted to choose between withdrawal of the plea and enforcement of the agreement:

> "[W]here a guilty plea has been induced by the prosecutor's agreement to make no recommenda- tion as to sentencing, and the prosecutor vio-

lates that agreement, the defendant may at his option have the guilty plea vacated. On the other hand, if the defendant so desires, he may elect to leave the plea standing and be resentenced [in the manner contemplated by the understanding]." *Miller v. State, supra,* 272 Md. at 255.

Numerous decisions of other courts have permitted defendants to enforce the terms of plea bargains in a similar fashion. *See, e.g., People v. Baker,* 46 Mich. App. 495, 208 N.W.2d 220, 221 (1973); *State v. Thomas, supra,* 294 A. 2d at 61-62; *cf. Braxton v. United States,* 328 A. 2d 385, 386-87 & n. 4 (D.C. Ct. App. 1974). We discern no persuasive reason here to deviate from the practice of providing defendants with an appropriate remedy when the State fails to honor its promises. *Cf. State v. Kuchenreuther, supra,* 218 N.W.2d at 623-24. Accordingly, we shall affirm the judgment of the Court of Special Appeals and permit Brockman to choose between the result of his already completed trial and the fulfillment of his bargain. Should he elect the latter, and plead guilty to murder in the second degree, the State is obligated to *nolle pros* the remaining counts contained in his indictment and to recommend to the trial court that the sentence not exceed imprisonment for ten years. However, if Brockman does choose to enforce his bargain, the actual punishment to be imposed is a matter for the trial court to decide. *See generally United States ex rel. Selikoff v. Commissioner of Correction,* 524 F. 2d 650, 653-54 (2d Cir. 1975), *cert. denied,* U.S., 96 S. Ct. 1725 (1976); Annot., 66 A.L.R.3d 902 (1975).

> *Judgment of the Court of Special Appeals affirmed.*
>
> *Costs to be paid by Prince George's County.*

*Murphy, C. J., dissenting:*

The affirmance in this case is based upon a finding by the Court that the State disavowed its agreement with

Brockman after he had substantially performed his obligation under the agreement. I respectfully dissent from that conclusion. While plea agreements are entitled to judicial enforcement where a guilty plea rests upon a promise by the State to drop certain charges or to recommend a limited sentence (or to make no recommendation as to sentence), *Santobello v. New York*, 404 U. S. 257, 92 S. Ct. 495, 30 L.Ed.2d 427 (1971); *Miller v. State*, 272 Md. 249, 322 A. 2d 527 (1974), the record in this case is totally devoid of any evidence that a finalized and binding agreement had in fact been reached at that point in the proceedings when the prosecutor declared ". . . there is no deal . . . everything is off." In my judgment, a review of the record compels this conclusion whether the facts are scrutinized from a contractual viewpoint or as a potential ". . . violation of our time-honored fair play norm, and accepted professional standards," *State v. Kuchenreuther*, 218 N.W.2d 621, at 624 (Iowa, 1974).

The State offered to accept a plea of guilty from Brockman to murder in the second degree, recommend to the court a sentence of no more than ten years and *nolle pros* all other counts in the indictment; in exchange, Brockman was to provide the State with a sworn deposition and testify before the grand jury and at the trial of whomever he implicated in the deposition as being the author of the murder scheme. To bind the State to its offer, Brockman was required to be truthful and candid in revealing all that he knew of the murder plot. When the offer was first made, Brockman refused it, but his co-defendant Maness accepted it; that same day, Maness fulfilled his part of the bargain by testifying before the grand jury. Brockman had a change of heart overnight and the State agreed to stand by its offer. But after agreeing to accept the State's offer, Brockman perjured himself in the course of his deposition by denying that he could identify Ward from photographs shown to him. Regardless of his motive, Brockman lied under oath by making a false statement material — indeed crucial — to the performance of the agreement, *i.e.*, his ability and willingness to identify his employer in the murder scheme.

In these circumstances, the State was plainly justified in declining to proceed with the agreement. Manifestly, the State did not have to extend the offer in the first place; it did not have to renew the offer after its initial rejection by Brockman; and most certainly, the State did not have to continue the offer once Brockman had demonstrated bad faith by lying under oath.

Brockman was in no way prejudiced by the agreement's cancellation, since the bargain was rescinded prior to the entry of any plea. Brockman's deposition was sealed by the court and not used at his trial, and no evidentiary leads were garnered, insofar as the record discloses, as a result of the taking of the deposition.

In characterizing Brockman's perjury as a "misstep amount[ing] to no more than an inconsequential hesitation insufficient to nullify the understanding," the majority misinterprets the nature and spirit of plea agreements. Treachery and deceit sought to be practiced by either party in the course of the implementation of such agreements are never in the interest of justice, and while it may be true that parties to plea agreements are often antagonistic and distrustful of each other's motives, that fact alone hardly justifies compelling a prosecutor to honor an agreement which, as here, has been so plainly undermined by the defendant's perjury, irrespective of the reason assigned for its commission. Refusing to acknowledge Ward as the person in the photographs was far more significant than a mere "de minimus infraction of his obligations," as the majority suggests; indeed, it so destroyed Brockman's integrity for truthfulness as to make it eminently reasonable for the State to decline to vouch for his credibility as a witness at Ward's trial. The State in every way measured up to the standards of fair play and equity as applied to plea negotiations in *Santobello* and *Kuchenreuther*, and accordingly I would reverse the judgment of the Court of Special Appeals.