468 A.2d 413

**Clinton ELLISON, Appellant,**

v.

**STATE of Maryland, Appellee.**

**No. 126, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Dec. 12, 1983.

■■■■■

■■■■■

■■■■■

Clarence W. Sharp, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender on brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City, Peter M. Semel and Timothy Doory, Asst. State's Attys. for Baltimore City, on brief, for appellee.

Argued before MOYLAN, ALPERT and GETTY, JJ.

GETTY, Judge.

Plea agreements are tolerated upon the assumption that they play an integral role in conserving judicial manpower and reducing backlogs of pending criminal cases. As we shall see from the present controversy, "it ain't necessarily so."

Clinton Ellison, appellant herein, advances five reasons why his convictions of murder and underlying felonies should be reversed. The linchpin of his attack upon the trial process, and the single argument presented before us, is the impropriety of the state's withdrawal from the plea agreement. If appellant is correct, a trial should not have taken place.

We do not insist that the cart was placed before the horse in this case, despite the fact that the issue of the state's right to disavow the plea agreement was deferred until after the trial on the merits. The non-jury trial, however, lasted ten days; and the jury trial, to determine whether life imprisonment or death was the appropriate disposition, con-

sumed an additional eleven days. Had the trial court belatedly held that the plea agreement should have been enforced, twenty-one days of trial time would have been for naught.

Keith Bee, Assistant Manager of the K-Mart store at the Northwest Shopping Plaza in Baltimore, was killed by a shotgun blast to the back of the head on Sunday, October 25, 1981. Bee, accompanied by his three year old son Jason, had gone to the store at approximately 7:30 A.M., to relieve the night maintenance personnel. The police were notified of the robbery at approximately 4:30 P.M. and, upon arrival at the scene, found Jason and two store employees inside the store. Bee's body was located in one of the aisles in the store. The gun rack in the store had been broken and shotguns, ammunition, watches, and cash had been taken in the robbery. The office safe had been opened and $7,000.00 in cash and $17,000.00 in checks had also been stolen.

Kurt Brooks, testifying under a plea agreement with the state, said that he and his brother, Karl Brooks, participated in the robbery with appellant. Entry was gained by Kurt Brooks accosting Bee with a knife at the front entrance to the store. Appellant and Karl Brooks came into the store while Bee and his son were forced to lie on the floor. Appellant did not want Bee to see him, because he was a former employee who had been fired by Bee.

Bee and his son were taken to the office to open the safe and then taken to the lounge area by Kurt Brooks. A relief man came to the front door and Kurt brought Bee from the lounge to unlock the door and admit the relief man. At the time, appellant was on the other side of the store. Kurt testified that immediately prior to leaving the premises appellant brought Bee to the front of the store and made him lie face down. At that time appellant shot Bee in the back of the head, stating that he had to kill Bee, because Bee recognized him.

Wayne Smith, who did not participate in the robbery, testified that he received a telephone call from Karl Brooks

at 9:30 A.M. on October 25th requesting Smith to pick him up near the K-Mart store. When Smith arrived, Karl Brooks, Kurt Brooks and appellant transferred the money bags from their car to Smith's vehicle. The money was divided at Kurt Brooks' house and Smith received all of the one dollar bills, amounting to $1,000.00, for his assistance. Over objection, Smith testified that during the time all three of the participants were in his car, Karl Brooks said that it was Kurt's fault that appellant had to kill Bee, because Kurt "was supposed to be keeping watch on the man." Appellant remained silent after this statement.

John Forbes testified that he and appellant were inmates at the Baltimore City Jail in February, 1982. Appellant, according to Forbes, admitted to him that he had killed Bee. Karl Brooks was expected to testify pursuant to a plea agreement, but declined by asserting his Fifth Amendment right to remain silent. Appellant admitted his participation in the robbery, but denied the killing which he attributed to Karl Brooks.

Maurice Jones testified that he, Lavell Samuel, Lavern Samuel and appellant were watching a television account of the robbery and murder and Jones said: "Clinton offed his boss." Appellant responded, "Don't say that because I could get ten years."

## PLEA AGREEMENT

Under the written plea agreement entered into between appellant and the state on November 20, 1981, appellant would have received a life sentence. His total sentence resulting from his conviction of murder and underlying felonies is life plus sixty-three years. The agreement provided that appellant would be allowed to enter a plea of guilty to murder in the first degree if four conditions were met, namely:

1. That appellant did not actually shoot Keith Bee.

2. That appellant give a complete and truthful statement concerning the activities of everyone involved in the robbery and murder.

3. That appellant testify truthfully before the Grand Jury of Baltimore City and in any trial involving the other participants in the crimes committed.

4. That appellant cooperate fully with the State's Attorney and the Baltimore City Police Department until the completion of the trials arising from this case.

The agreement further provided that if appellant breached any of the conditions the agreement might be voided in its entirety at the sole discretion of the state.

Extensive negotiations between the state and appellant's counsel commenced on November 17, 1981, and continued through November 20, when the agreement was signed. The format involved the state submitting a list of questions to appellant and his counsel, and appellant, after conferring with counsel, would submit his answers in writing. The State's Attorney and appellant remained in separate rooms; there was no face to face confrontation. The entire procedure covered twenty hours.

After the agreement was signed, appellant gave a full written statement and went before the Grand Jury. The state apparently accepted appellant's initial denial of being the triggerman, because the state knew that the gloves worn by appellant during the robbery and murder did not contain gunshot powder. This surmise on the state's part was somewhat shaken when the state learned that the closed weapon involved would not produce powder residue. The agreement was voided by the state by letter dated February 26, 1982, wherein the state informed appellant that he lied in statements made pursuant to the agreement and the state believed, contrary to appellant's statement, that he killed Keith Bee.

Justification for the state's decision to disavow the agreement must be predicated upon what the state learned between November 20, 1981, the date of the agreement, and

**574**

February 26, 1982, the date the state voided the agreement. Responsibility for the development of the case rested with Assistant State's Attorney Timothy Doory. He testified to the following discrepancies that led to the state's decision to void the plea agreement:

1. Appellant minimized his role in the pre-robbery planning. An interview with Michael Muldrow[1] on November 20, after the agreement was signed, indicated that appellant was the principal architect of the contemplated robbery.

2. Appellant alleged he was never in the area where the body was found. When he was taken to the store, he pointed out the precise location of the body. This area was not visible from the location appellant alleged he was in when the shooting occurred.

3. Appellant claimed he had not touched any of the watches taken in the robbery. Gold residue was detected on the gloves appellant wore during the robbery.

4. Appellant stated Karl Brooks killed Keith Bee. Wayne Smith, interviewed after the plea bargain, related the conversation in the car wherein Karl stated it was Kurt's fault appellant had to kill Bee and appellant remained silent.

5. Subsequent to the plea agreement, the state learned from Maurice Jones, Lavell Samuel and Lavern Samuel that the three were watching an account of the K-Mart robbery on television and appellant, who was also present, turned it off. Jones said, "Clinton offed his boss," and appellant responded, "Don't say that because I could get ten years."

6. The state then interviewed Karl and Kurt Brooks and concluded that they were truthful, and the corrobo-

---

1. Michael Muldrow declined to participate in the robbery. He was present on October 24th when the matter was planned by appellant and the two brothers, Karl and Kurt Brooks.

rated evidence from the various witnesses indicated that appellant did the killing.

## THE LAW

This case is analogous to *State v. Brockman,* 277 Md. 687, 357 A.2d 376 (1976), in that the appellant did not plead guilty to any charge, but stood trial as a result of the state's refusal to carry out the bargain prior to the time appellant was to be afforded the opportunity to confess guilt. In *Brockman,* the Court of Appeals noted that the standard to be applied to plea negotiations is one of fair play and equity under the facts and circumstances of the case. The Court held that if the defendant has to a substantial degree and in a proper manner performed his obligations and is willing to fulfill the remainder of his promises, the state shall be held to its bargain.[2]

*Sweetwine v. State,* 42 Md.App. 1, 398 A.2d 1262 (1979) dealt with the issue of double jeopardy following an aborted plea agreement. The language of the case (Moylan, J.), however, is relevant herein.

"May a defendant strike a bargain with the State, repudiate that bargain so far as his obligations under it are concerned and yet retail all of the advantages he ostensibly bargained for?

The answer is an immediate and absolute, 'No.' Bargaining in bad faith will not be countenanced, let alone rewarded, on either side of the trial table. Appropriate are the words of Cardozo, 'Justice, though due to the accused, is due to the accuser also .... We are to keep the balance true.' *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674."

---

**2.** Brockman refused to identify a single photo of the co-conspirator, because he thought a trial judge would decide the identification to be tainted, and as a result the state would then refuse to honor Brockman's agreement to testify. Upon this refusal, the state withdrew the agreement.

The government withdrew from a plea agreement in much the same fashion as the state did herein in *United States v. Calabrese,* 645 F.2d 1379 (10th Cir.1981). The defendant, Knowles, agreed to plead guilty to conspiracy and testify truthfully in the Grand Jury and trial proceedings (concerning racketeering). Before trial the government notified Knowles by letter that the agreement was void due to his refusal to be interviewed by the F.B.I. Following his conviction and sentencing, Knowles moved to vacate the sentence alleging that the government breached the agreement.

The Tenth Circuit held that due process rights are involved in plea negotiations and a defendant must be accorded requisite fairness to insure what is reasonably due under the circumstances. One safeguard is a judicial determination, based on adequate evidence, of a defendant's breach of a plea bargaining agreement. The question of a breach is not to be unilaterally determined by the government, and the constitutional principles of fairness require that once the government acknowledges the existence of an agreement, the government has the burden of establishing that breach.

Appellant herein initiated plea negotiations shortly after he turned himself in to the police. At the time of the agreement, the investigation was ongoing and there is not a scintilla of evidence that the state acted in bad faith. The discrepancies in appellant's version of his participation in the robbery and murder were based entirely upon investigation and questioning of witnesses *after* the agreement was reduced to writing.

■ Appellant received a full evidentiary hearing before Judge Perrott on the issue of whether he lied about his participation in the robbery and murder, and the court held beyond a reasonable doubt that his testimony was not credible. We hold that Judge Perrott's decision was supported by substantial evidence and is not, therefore, clearly erroneous. Md.Rule 1086. Appellant suggests that the trial judge, having already heard the case on the merits, may have considered evidence outside the time frame of November 20,

1981 to February 26, 1982 in deciding the issue of the state's voiding the plea agreement. Both parties agreed to this procedure prior to trial and indicated their belief that the court could separate the facts relevant to the trial from the facts applicable to the plea agreement. The parties having made that determination, we see no reason to conclude that the court did otherwise.

Unquestionably, the state's primary concern in placing express conditions in the plea agreement was to avoid making any deal with the actual killer of Keith Bee. The vicious and wanton execution of Bee in the presence of his three year old son warranted seeking the death penalty for the triggerman. We question, without deciding, whether the inconsistencies in appellant's version of the crime, unrelated to who actually committed the murder, would be sufficient to affirm the state's decision to void the agreement. We hold that the state was justified in revoking the agreement when, as a result of the continuing investigation, it became aware of facts sufficient to charge appellant as the actual killer. Appellant was fully aware at the time he entered into the agreement that the investigation had not been completed and that the state would void the agreement if any credible evidence came to light indicating that appellant was the killer. He gambled and lost.

Citing the Court of Appeals opinion in *Jones v. State,* 297 Md. 7, 464 A.2d 977 (1983), appellant insists that reversal is mandated because the trial court refused him the Grand Jury testimony of John Forbes, Frederick Schroeder and Lamont Macey. The focus upon Grand Jury testimony was to determine whether the state had utilized such testimony in deciding to void the plea agreement. Accordingly, appellant received a transcript of the Grand Jury testimony of Michael Muldrow, Wayne Smith, Karl Brooks and Kurt Brooks.

*Jones, supra,* recognizes the right of an accused to inspect Grand Jury testimony after a witness has testified in a trial on the merits. The Supreme Court adopted the "particular-

ized need" test in *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). The mere showing that a witness has testified before a Grand Jury is not sufficient to establish "particularized need" under *Pittsburgh Plate*. By dictum, in *Attorney Grievance Commission v. Strathen*, 287 Md. 111, 411 A.2d 102 (1980), the Court of Appeals recognized that Grand Jury minutes may be obtained by a defendant if he shows a "particularized need" for disclosure. *Jones* holds "that after a State's witness has testified on direct examination a defendant is entitled to inspect the Grand Jury testimony for cross-examination purposes without any requirement that he show any other need."

The holding in *Jones* does not address whether the same rationale applies to motions filed and hearings conducted prior to or contemporaneously with a trial on the merits. We point out that the Grand Jury minutes in this case were not being sought for the purpose of cross-examination, but for the sole purpose of determining what the state may have known up to the time it voided the agreement on February 26, 1982. The limited purpose in seeking Grand Jury minutes is evidenced by appellant's counsel:

"I have already pointed out to the court that we are not in here fishing for something. We are concerned with a single issue, did Clinton Ellison pull the trigger or not. He was part of a robbery. He was there. We are saying he is going to receive a life sentence one way or the other."

The trial transcript reveals that Lamont Macey testified to a conversation with appellant which related only to appellant's being fired by the deceased, Keith Bee, several weeks prior to the robbery. Frederick Schroeder testified that he observed appellant and two other males inside the K-Mart store on the day of the robbery. Schroeder was conducting a "motor cross" on the parking lot on the day of the robbery. Obviously, this testimony had no bearing on whether appellant was the "triggerman." John Forbes testified that several days after he became acquainted with

appellant in the Baltimore City Jail appellant admitted the killing of Bee. The record discloses that the petition to transfer appellant to the jail was filed February 25, 1982. The agreement was voided the following day, prior to Forbes' conversation with appellant. That conversation, therefore, did not form a basis for the state's decision. On the facts of this case, and considering the limited purpose for which disclosure of Grand Jury testimony was sought, we hold that the court did not err in denying the request for the Grand Jury testimony of the three witnesses. The trial court reviewed the Grand Jury testimony to determine whether any of that testimony related to appellant being the killer. Appellant's specific purpose in obtaining that testimony, as evidenced by counsel's statement to the court, precludes his argument before us that under *Jones* he was entitled to the testimony for cross-examination purposes. We agree that under *Jones* the court may not determine for an accused whether any basis exists for cross-examination of a witness by the use of Grand Jury testimony. The issue in this case, however, is distinguishable.

Appellant's motion for a new trial was based upon a note written by Kurt Brooks to appellant while both were incarcerated in the Baltimore City Jail. The note was in the form of an affidavit for appellant to sign and contained a threat to appellant and a statement that Kurt Brooks could not tell on his brother Karl. The nature of what Kurt "could not tell" about Karl has not been revealed. The note was originally in the possession of appellant and then in the possession of defense counsel, and was eventually turned over to the state, because it represented a threat to appellant's safety at a time when appellant and Kurt Brooks were in the same institution.

Appellant mentioned the note to his counsel prior to trial. Defense counsel could not locate the note in his file and he asked the state to search for it. The state was unable to locate the note or to recall its contents. After appellant's guilt was established, but before sentencing, appellant again mentioned the note to counsel in more detail. Appellant's

counsel contacted the state again and the note was finally located in a safe in the State's Attorney's office. The note was presented to the court before sentencing and was introduced at the Motion for New Trial.

Appellant concedes that the note was not deliberately withheld by the state. By due diligence counsel could have learned of the content of the note when apprised of its existence prior to trial. It was not until appellant referred to the note a second time that counsel learned what Kurt Brooks said in reference to his brother Karl. If appellant's counsel had concentrated on what the note said rather than on finding the document, Kurt Brooks could have been cross-examined on the content of the note regardless of whether the note was available, lost, or destroyed.

Appellant cites *Jones v. State,* 16 Md.App. 472, 298 A.2d 483 (1973), relating to five verities [3] that must be present to justify the granting of a new trial on the basis of newly discovered evidence. Assuming for the purposes of discussion that the issue is newly discovered evidence, rather than suppression of evidence, appellant's argument is not persuasive. First, the evidence is not newly discovered; appellant knew of the note before the trial and did not diligently inquire of its contents. Second, appellant's involvement in the robbery and murder is undisputed. A new trial would not "probably produce an acquittal."

On the issue of suppression of evidence, we turn to *Giles v. State,* 239 Md. 458, 212 A.2d 101 (1965). Initially, we point out that where the alleged exculpatory evidence is in the hands of the appellant, turned over to his counsel and ultimately given to the state, we fail to see how appellant's failure to read and remember what was said amounts to suppression by the state. Giles says:

---

3. (a) Discovered since the trial; (b) diligence on the part of the movant; (c) evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; (e) on a new trial, the newly discovered evidence would probably produce an acquittal.

" . . . evidence which is claimed to have been suppressed must be reasonably considered to be admissible and useful before suppression may be said to exist . . . but it must be such, if it had been offered in evidence, as would be capable of clearing or tending to clear the accused of guilt—i.e., it must be exculpatory."

Based upon appellant's admitted participation as a principal in the crimes charged, the note would not have "tended to clear him of guilt."

■ It is essentially the function of the trial judge to evaluate and assess the newly discovered evidence and to determine the materiality and credibility of such testimony. The granting or denial of a motion for a new trial lies within the sound discretion of the trial court. The action of the trial court upon such a motion will not be disturbed on appeal except under the most extraordinary and compelling reasons. *Jones v. State,* 16 Md.App. 472, 298 A.2d 483 (1973); *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78 (1975). We find no abuse.

■ Appellant's argument that the evidence is insufficient to convict him of the shooting and of assault upon Jason Bee is patently absurd. Nothing in *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977), requires corroboration of each element of the *corpus delecti;* identification of appellant with the crime itself is sufficient. Appellant does not contest that Jason Bee was assaulted. Assault is a misdemeanor; all participants are chargeable as principals. *Agresti v. State,* 2 Md.App. 278, 234 A.2d 284 (1967).

■ Finally, appellant complains of the admission of the out of court statements of Karl Brooks to his brother Kurt, and the conversation between appellant and Maurice Jones. Assuming, without deciding, that the statements were inadmissible, they were harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). Appellant's participation in the crimes was not contested. Appellant, if not the killer, was at least a principal in the second degree and equally culpable under the law.

**582**

Additionally, the failure of a party to speak to or deny an assertion of fact by another may be regarded as circumstantial evidence of the truth of the statement. *Ewell v. State,* 228 Md. 615, 180 A.2d 857 (1962); *McDowell v. State,* 31 Md.App. 652, 358 A.2d 624 (1976). The error found in both cases involved a failure to instruct the jury that a failure to deny only gives rise to an inference and is not direct evidence. No such error is present here, because this case did not involve a jury.

JUDGMENTS AFFIRMED.

Costs to be Paid by Appellant.