REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND


No. 2100

September Term, 2013


MATTHEW NICHOLAS BURTON

v.

GARRY MUMFORD, WARDEN


Berger,
Arthur,
Kenney, James A., III,
      (Retired, Specially Assigned)

JJ.


Opinion by Kenney, J.


Filed: October 8, 2014

The appellant, Matthew Burton, filed a Writ of Habeas Corpus in the Circuit Court for Worcester County challenging his extradition to Delaware. The circuit court denied the writ, but stayed Burton's extradition until the conclusion of this timely appeal. Burton submits one question for our review, which we have rephrased into the following two questions:[1]

> 1. Did the circuit court err in denying Burton's Writ of Habeas Corpus because it incorrectly applied the *Doran* requirements[2]?

> 2. Did the circuit court err by dismissing Burton's Constitutional and Maryland Declaration of Rights claims?

For the following reasons, we shall affirm the judgment of the circuit court.

## BACKGROUND

On June 15, 2012, the Worcester County police found in a wooded area near the Delaware-Maryland border the body, later identified as Nicole Bennett, a missing Delaware resident. Through investigation, Maryland authorities came to believe that Burton was

---

[1] Burton's Brief presents the question as follows:

> 1. Whether the court erred in denying Mr. Burton's Petition for Writ of Habeas Corpus?

[2] In *Michigan v. Doran*, 439 U.S. 282, 289 (1978), the Supreme Court stated that

> [o]nce the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive.

responsible for Mrs. Bennett's death and charged him with first- and second- degree murder. Because Burton was a resident of Delaware, Maryland Governor Martin O'Malley submitted an application for requisition to Delaware Governor Jack Markell, who, in turn, issued a Governor's Warrant of Rendition for Burton. Delaware authorities apprehended Burton in Sussex County, Delaware on August 6, 2012. After failing to obtain habeas corpus relief in Delaware, Burton was transported to Worcester County.

A Maryland grand jury indicted Burton on crimes related to Mrs. Bennett's death including murder, rape, and kidnapping.[3] The State of Maryland notified Burton that it would be seeking the death penalty, but, when Maryland repealed the death penalty in 2013, that notice was withdrawn.

On May 31, 2013, the State's Attorney for Worcester County wrote Burton's counsel:

> Please find attached copy of a letter dated May 8, 2013 from the Delaware Department of Justice regarding the above referenced criminal matter.[4]

---

[3] The record indicates that Burton was indicted for other crimes related to the death of Mrs. Bennett, but those additional charges are not specified in the record before us.

[4] The Delaware Department of Justice letter stated, in part:

> Thank you for meeting with my office on February 19, 2013 and providing us with your case file and investigating reports . . . relative to the Murder of Nicole Bennett. . . . Delaware has a substantial interest in this case because the evidence indicates Nicole Bennett was taken against her will [from a location in Delaware], raped, murdered, and ultimately discovered in . . . Maryland. . . .
>
> Delaware is interested in bringing criminal charges against

2

Based upon recent discussion with other interested jurisdictions it has been determined that the Delaware Department of Justice will indict and prosecute your client on charges related to the kidnapping, rape, and murder of Nicole Bennett on June 14, 2012. The Delaware Department of Justice has expressed their intent to initiate a capital prosecution against the Defendant. Any prosecution by Delaware will supersede the current criminal case in the State of Maryland.

This criminal matter may be concluded in the State of Maryland should the Defendant agree to the following conditions:

\* \* \*

2. The Court will impose the following binding sentences:

> a.     As to the Count One, First Degree Murder, the Defendant will receive a sentence of Life without the Possibility of Parole, consecutive to any other sentence previously imposed upon the Defendant in Worcester County, Maryland or in any other jurisdiction;

> b.     As to Count Three, First Degree Rape, the Defendant will receive a sentence of Life without the Possibility of Parole, consecutive to Count One and consecutive to any other sentence previously imposed upon the Defendant in Worcester County, Maryland or in any other jurisdiction. . . .

\* \* \*

If your client fully accepts each and every term and condition of

---

Matthew Burton . . . [I]t is an important consideration that this case, if prosecuted by the State of Delaware, is a capital eligible case. If the death penalty is not imposed in Delaware, the sentence is mandatory life without the possibility for parole.

\*\*\*

> this letter please sign and have your client sign the original and
> return it to the State no later than noon on July 1, 2013 at which
> time this offer will expire. . . .

Burton rejected the plea offer, and on August 12, 2013, the State nol prossed[5] all pending charges in Maryland.

Seven days later, a Delaware grand jury indicted Burton on two counts of first-degree murder and one count of first-degree rape related to Mrs. Bennett's death. On September 25, 2013, Governor Markell submitted an application for requisition to Governor O'Malley. That submission included (1) Governor Markell's signed application for requisition along with the sworn statement of Deputy Attorney General Elizabeth R. MacFarlan, (2) a docket sheet, (3) a grand jury indictment, (4) a warrant for Burton's arrest, (5) the Delaware Attorney General's Identification Report including a fingerprint card, and (6) an annexed application for requisition, which included an application for requisition signed by Governor Markell, representations by Deputy Attorney General Elizabeth R. MacFarlan, and copies of the Delaware Code concerning murder and rape. Governor O'Malley signed a Governor's Warrant of Rendition for Burton on October 28, 2013.

As authorized by Maryland Code (2001, 2008 Repl. Vol.), § 9-110 of the Criminal Procedure Article ("C.P."), Burton filed a Writ of Habeas Corpus challenging his extradition

---

[5] "A nolle prosequi discharges the defendant on [that particular] charging document or count which was nolle prossed, . . . [but] does not preclude a prosecution for the same offense under a different charging document or different count." *Silver v. State*, 420 Md. 415, 424 n. 5 (2011) (citing *Ward v. State*, 290 Md. 76, 82 (1981)).

4

to Delaware.  At a November 4, 2013 hearing, the circuit court held:

> The case of Michigan versus Doran . . . limit[s] the Court's [consideration to] four items:  . . . whether the extradition documents on their face are in order.  There's been argument, primarily the argument has been the identification . . . isn't good enough, it said Wicomico instead of Worcester, even though I have the file here and everyone knew it was Worcester.  I quite frankly find that to be equivalent to a typo.  It's what the case referred to as a minor irregularity and I find - - both arguments that [Burton has] made on that issue being minor irregularities.
>
> Whether the Petitioner has been charged with a crime in the demanding state. . . . Of course he had been charged with two counts of first degree murder and one count of first degree rape. . . .
>
> [T]he third one is whether the petitioner is the person named in the request for extradition.  And I find the arguments that were made in that regard are without merit, it's almost desperate.  There's no requirement about fingerprints. . . . We have an affidavit in the file saying he's who he is, it's signed by him. . . . it's just without merit.
>
> Whether the Petitioner is a fugitive. . . . Under the extradition . . . definition . . . if you're in another state and charged with a crime from another state you're a fugitive. . . . [Y]ou don't have to sneak over here.  And the fact that he came over here against his will . . . makes no difference as far as the extradition process goes.
>
> So on those four [Burton] loses. . . . But I do want to go just a little bit further and address these arguments. . . . [Burton argues that] [t]he prosecution[']s attempt to extradite [him] back to Delaware is  vindictive and violated the due process clause of the United States Constitution and the Maryland Declaration of Rights. . . . You could draw the conclusion that it's vindictive.  But it's a guess, it's simply a guess.  There's been no offer of proof or anything, it's just that, well, you've got this letter, and you know, we've had numerous hearing[s] and motions, we've

5

had three trial dates set. So in the meantime Maryland did away with the death penalty and Delaware still has theirs and that's the only reason it's being sent there is because . . . they want to subject [Burton] to the death penalty. . . . [T]hat's a good argument I suppose, but all it is is [Burton's] suggestion of what it indicates to [him], it's really nothing else. So [Burton] lose[s] on that argument. . . .

* * *

[Burton contends that his] extradition . . . violated the Eighth Amendment to the United States Constitution and Article[s] of the Maryland Declaration of Rights. And again, I think this had to do with the death penalty and the vindictiveness and all and I've addressed that. So really it's the same argument, it's just their raising it to a constitutional level. But for all of the same reasons the Court rules against [Burton] on that argument. . . .

[Burton asserts that] the State of Maryland is legally bound to its previous statements and is collaterally estopped from now adopting an inconsistent position. Actually, if you want to get technical about it, they're not. They nolle prossed the case. It's no longer in existence, and what we're doing now is we're arguing what the State of Delaware is alleging who's the one now trying to get [Burton] back there to prosecute him. So I don't find any merit in [that] argument. . .

* * *

[The State argues that that constitutional claims are] not within the permissible scope of the habeas corpus hearing; he may be right, but I addressed [them] anyway. Even if permissible the argument is without merit and not supported by any authority. I've addressed that and I agree. . . .

[The State] says minor irregularities . . . minor defects in the wording or discrepancies between charging papers and the requisition do not affect the asylum state's action. In other words, to be considered problems of the demanding state. And that's sort of what I've alluded to a couple of times . . . A lot of

6

these arguments seem more appropriately raised in Delaware than here, and undoubtedly as [Burton's] counsel suggests they will be raised there . . .

* * *

[T]he former application for requisition was made by the State of Maryland, not the State of Delaware, therefore, there's been no former application for requisition but that demanding state which is something I've already alluded to and I agree. That there was no delay in the prosecution of the said crime and the application of a requisition. Being [that Delaware] just recently charged him in Delaware with these crimes, I'll have to agree with that, but undoubtedly that is going to be a very serious argument to be raised in Delaware.

* * *

The circuit court denied the writ, but, at Burton's request, later ordered a stay of his extradition pending this timely appeal.

## DISCUSSION

Modern interstate extradition proceedings arise out of the Extradition Clause of the United States Constitution:

> A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State shall on Demand of the executive Authority of the State from which he fled, be delivered up to be removed to the State having Jurisdiction of the Crime.

U.S. Const. art. IV § 2, cl.2. The United States Supreme Court has explained the purpose and intent of the Extradition Clause:

> The Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. The purpose of the Clause

7

was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV. The Extradition Clause, like the Commerce Clause served important national objectives of a newly developing country striving to foster national unity. In the administration of justice, no less than in trade and commerce, national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy.

Interstate extradition was intended to be a summary and mandatory executive proceeding derived from the language of Art. IV, § 2, cl. 2, of the Constitution. The Clause never contemplated that the asylum state was to conduct the kind of preliminary inquiry traditionally intervening between the initial arrest and trial.

*Doran*, 439 U.S. at 287-88 (citations omitted).

Because the Extradition Clause was not self-executing, Congress enacted the Act of 1793, which outlined the procedural requisites of interstate extradition proceedings. 18 U.S.C. § 3182 (2012).[6] States began to adopt their own variations of the Act of 1793, and

---

[6]The Act of 1793 states:

Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District, or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause

8

inconsistency among the states prompted the National Conference of Commissioners on Uniform State Laws to adopt the Uniform Criminal Extradition Act in 1926. *Report of the Standing Committee on Uniform State Laws*, 49 Annu. Rep. A.B.A. 527, 562 (1926). After several revisions, the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Criminal Extradition Act of 1936. 46th Conference Handbook of the National Conference of Uniform State Laws and Proceedings of the Annual Meeting 23 1936 pp. 154-55.

The Maryland General Assembly in 1937 adopted for the most part the Uniform Criminal Extradition Act of 1936.[7] 1937 Md. Laws Ch. 179; Md. Code 1939, art. 41 § 13. With the exception of the 1977 addition of Md. Code art. 41, §28A (what is now Maryland Code (2001, 2008 Repl. Vol.) § 9-114 of the Criminal Procedure Article ("C.P."), Maryland's extradition law has only endured stylistic alterations and is now codified in C.P. §§ 9-101 - 9-128.

---

him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

18 U.S.C. § 3182 (2012).

[7] The General Assembly adopted the Uniform Criminal Extradition Act of 1936 in its entirety except § 14, which was later adopted in 1977, 1977 Md. Laws Ch. 570, and § 24, which the Commissioners deemed optional. We note that like many states, Maryland added details to the Act to conform with the Maryland legal system, but changes were not significant.

Extradition is essentially an executive process, but the judiciary does have a limited role when considering Writs of Habeas Corpus arising from extradition proceedings. The *Doran* Court held that

> a court considering release on habeas corpus [in an extradition proceeding] *can do no more than* decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable.

*Doran*, 439 U.S. at 289 (emphasis added).

A court begins its inquiry with the presumption that "once a governor has granted extradition, . . . there is prima facie evidence that constitutional and statutory requirements have been met." *Doran*, 439 U.S. at 289. The Court of Appeals has likewise opined that the Governor's issuance of a Warrant of Rendition, "raises [the] presumption that the accused is the fugitive wanted and [the warrant] is sufficient to justify his arrest, detention[,] and delivery to the demanding state." *Solomon v. Warden, Baltimore City Jail*, 256 Md. 297, 300-01 (1969) (citations omitted); *see also Bryson v. Warden, Baltimore City Jail*, 287 Md. 467, 470 (1980). And, as this Court has stated, there is a presumption that when the Governor grants extradition, the Governor's Warrant of Rendition and all documents accompanying the original demand are in order. *Roscoe v. Warden, Baltimore City Jail*, 23 Md. App. 516, 521-22 (1974). To rebut the presumptions that the constitutional and statutory requirements have been met, and receive habeas corpus relief, the accused must "prove

10

beyond a reasonable doubt either that he was not present in the demanding state at the time of the alleged offense or that he was not the person named in the warrant. . . ." *Solomon*, 256 Md. at 300-01. This requires "'overwhelming evidence,'" not mere contradictory evidence. *Id.* at 301 (citing *Mason v. Warden*, 203 Md. 659, 661 (1953)).

Burton's challenges to the circuit court's denial of his Writ of Habeas Corpus rest on two contentions: (1) that the circuit court erred in its application of the *Doran* requirements; and (2) that the extradition proceedings in this case have violated his due process rights and rights against cruel and unusual punishment under the United States Constitution and the Maryland Declaration of Rights. We will address his claims in that order.

### *Whether the extradition documents are on their face in order*

Burton contends that, on their face, Delaware's extradition documents are not in order because they incorrectly state that (1) he was in Wicomico County rather than Worcester County; (2) "no former application for requisition for [him] growing out of the same transaction has been made;" and (3) "no delay has occurred in the prosecution of said crimes once [he] was located." In his view, these errors are not "typo[s]" or "minor irregularities," and therefore, are sufficient to find the extradition documents are not on their face in order.

The State responds that the circuit court did not err in finding that the errors in Delaware's extradition documents were minor typographical errors, and, despite these errors, there remained "a lawful demand from the Governor of Delaware supported by affidavits, identification of Burton, and a copy of an indictment."

11

Maryland appellate courts have yet to address whether "typo[s]" or "minor irregularities" of a clerical nature can invalidate extradition documents, but several of our sister states have concluded that such minor errors do not invalidate extradition documents. *See, e.g., State v. Mckenzie*, 179 W.Va. 300, 301 (1988) (a warrant indicating that "police officers had been 'appointed by the Governor of the State of Pennsylvania' (rather than by the Governor of the State of New York) and that the appellant was to be conveyed to Pennsylvania (rather than New York)" "was [an error] of clerical nature and did not constitute such a harmful error as to justify the discharge of the appellant"); *Andrews v. State*, 241 Ind. 180, 181, 169 N.E.2d 193, 193-94 (1960) (misspelling Alabama ("Alamaba") on an extradition request was a mere typographical error and did not invalidate the extradition documents); *Ex parte Morrow*, 310 Mich. 597, 599, 17 N.W.2d 767, 768 (1945) (referencing to a warrant as an affidavit was harmless error). Such opinions reflect an understanding that allowing minor typographical or clerical irregularities to invalidate extradition documents would conflict with the United States Supreme Court's admonition that "care must be taken [so] that the process of extradition [is] not so burdened as to make it practically valueless." *Doran*, 439 U.S. at 288 (citing *In re Strauss*, 197 U.S. 324, 332-333 (1905)). We agree that careful consideration must be given to a claim that a minor typographical or clerical error is sufficient to invalidate extradition documents.

Burton contends that the reference to Wicomico County as his residence rather than Worcester County is sufficient to render the extradition documents not, on their face, in

12

order. The State responds that Burton has not proven beyond a reasonable doubt that he was not in Wicomico County at the time of the extradition request. But, even if he had, the correct name of the county is insignificant because it was only necessary for the Governor to be satisfied that Burton was "*in Maryland*" in order to issue a Governor's Warrant of Rendition. (Emphasis in original).

The record reveals that only two documents reference Wicomico County as Burton's residence - (1) the sworn statement by the Delaware Deputy Attorney General and (2) the Deputy Attorney General's representations in the annexed application for requisition. The other documents accompanying Delaware's application for requisition indicate that he was located in Worcester County. For example, the Delaware Attorney General's Identification Report provides that Burton's "other known address" is "5022 Joyner Road, Snow Hill, MD 21863," which is the address of the Worcester County Jail. *Worcester County Jail*, The Official Website of Worcester County, Maryland, http://co.worcester.md.us/jail/jail.aspx (last visited August 29, 2014). In addition, Worcester County Sheriff Reggie Mason received the Governor's Warrant of Rendition on October 29, 2013, along with a letter from Maryland's Extradition Coordinator requesting that "[w]hen the Warrant of Rendition is executed before a judge and the fugitive is ready for return, please notify John Desmond . . . and return this warrant to our office as your final report. . . ." The assertive language in the Extradition Coordinator's letter to the Worcester County Sheriff further supports the circuit court's

13

finding that "everyone knew [the documents meant] Worcester[,]. . . . [and the error was the] equivalent to a typo. . . ."[8]

The burden to prove beyond a reasonable doubt that the extradition documents are not on their face in order falls on Burton. *Solomon*, 256 Md. at 300-01. Starting from the presumption that, when a governor grants extradition, the Governor's Warrant of Rendition *and all documents accompanying the original demand* are in order, we are persuaded that that burden was not met. *See Roscoe*, 23 Md. App. at 521-22. These errors are minor typographical or clerical errors that do not destroy the validity of the documents.

Burton also asserts that, because Maryland itself had filed an application for requisition to extradite Burton from Delaware, its authorities "had *actual knowledge* that there had been a former application for a requisition for [him] growing out of the same transaction," (Emphasis in original), and yet, despite this knowledge, Maryland did not reject the Delaware Deputy Attorney General's statement that "'no former application for requisition for [Burton] growing out of the same transaction' ha[d] been made."

According to the State, Delaware was only assuring "that Delaware *itself* [was] not engaging in an abuse of the extradition process and . . . the contested language is a reference

---

[8] To be sure, there is no way to conclusively determine that the Extradition Coordinator did not send a letter to the sheriffs in all the counties in Maryland because the Governor's Warrant of Rendition states, "TO: ANY SHERIFF, DEPUTY SHERIFF AND OTHER PEACE OFFICERS OF AND IN THE SEVERAL CITIES AND COUNTIES THIS STATE[,]" but coupled with the specific address in the Attorney General's Identification Report, it lends support to the circuit court's findings.

14

to whether Delaware *itself* has made a prior extradition request arising from the underlying incident." (Emphasis in original).

In considering this issue, the circuit court reasoned that "the former application for requisition was made by the State of Maryland, not the State of Delaware, therefore, there's been no former application for requisition" by Delaware. We agree that Delaware's extradition documents were only certifying that *Delaware* had not submitted an application for requisition of Burton.[9]

Maryland's extradition statute states,

(a) In general - A demand for the extradition of a person charged with crime in another state may not be recognized by the Governor unless it is:

(1) in writing and alleging, except in cases arising under § 9-106 of this title, that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter the accused fled from the state; and

(2) accompanied by:

(i) a copy of an indictment found or by information supported by affidavit in the state having jurisdiction of the crime, or by a copy of an affidavit made before a justice of the peace or magistrate there, together with a copy of any warrant which was issued thereupon

\* \* \*

---

[9] It is worth noting that the Delaware Deputy Attorney General's Statement was in the annexed application for requisition, which was not certified by a notary, and was not included in the final certifications made in the final application for requisition.

15

(b) Contents of demand. - (1) The indictment, information, or affidavit made before the magistrate or justice of the peace must substantially charge the person demanded with having committed a crime under the law of that state.

> (2) The copy of indictment, information, affidavit, judgment of conviction, or sentence must be authenticated by the executive authority making the demand.

C.P. § 9-103. The plain language of this statute does not require a certification "that no former application for a requisition for said fugitive, growing out of the same transaction has been made." Assuming, however, that such a certification was required,[10] it would seem illogical to require a state to certify what another state may have done. Moreover, Governor O'Malley had sufficient accurate information to determine the issues before him. *See People v. Hardiman*, 152 Ill. App. 3d 38, 43, 504 N.E.2d 109, 113 (1987) (holding that even though the State of Florida had to resubmit an application for requisition and thereby incorrectly stated that "no former applications for requisition [had] been made," the claim was without

_____

[10] The Maryland Extradition Manual does have an attached "Form 1" that seems to request such a statement in an application for requisition. Nolan H. Rogers (revised by Edward O. Siclari), *Maryland Extradition Manual*, App. B (rev. ed. 2013). Maryland Courts have on occasion cited the Maryland Extradition Manual, but in all cases Maryland Courts have only considered this document as a guide that did not have legal force. *See Laster v. State*, 313 Md. 548, 551 (1988) (stating that the Attorney General's adoption of I.A.D. forms was in the Maryland Extradition Manual); *State v. Smith*, 73 Md. App. 378, 381 (1987) (using the Maryland Extradition Manual to determine whether an arrest warrant was a detainer); *Statchuk v. Warden, Maryland Penitentiary*, 53 Md. App. 680, 689 (1983) (using the Maryland Extradition Manual as a reference about the procedures adopted by Maryland); *Utt v. Warden, Baltimore City Jail*, 48 Md. App. 486, 493 (1981) (using the Maryland Extradition Manual to demonstrate that an executive hearing in an extradition proceeding is implemented "in Maryland as a matter of policy"). We see no reason to interpret the Maryland Extradition Manual otherwise.

merit because "[t]he Governor of Illinois had before him additional correct information to ensure that he could properly decide the matter at hand.").

According to Burton, the extradition documents are also not in order because they falsely assert "that no delay has occurred in the prosecution of said crime once [he] was located." He states that "Maryland had *actual knowledge* that Delaware had delayed more than a year in prosecuting [him]. . . ." (Emphasis in original). The State interprets, and we agree, this claim is a right to a speedy trial claim, which is a constitutional claim that we will address below.

### *Whether Burton has been charged with a crime in Delaware*

Burton asserts that Delaware has not demonstrated that they have jurisdiction over a criminal case related to Mrs. Bennett's death, and therefore, this Court cannot conclude he is charged with a crime until Delaware establishes jurisdiction. But, "[t]he [Extradition] Clause never contemplated that the asylum state was to conduct the kind of preliminary inquiry traditionally intervening between the initial arrest and trial." *Doran*, 439 at 288. A Delaware grand jury has now indicted Burton, and upon that indictment, a Delaware judge has issued a warrant for Burton's arrest. It is not for Maryland courts to question Delaware's grand jury indictment or its arrest warrant.

### *Whether Burton is the person named in the request for extradition*

Relying again on the extradition documents' incorrect statement that Burton was in Wicomico County rather than Worcester County, Burton contends that the circuit court erred

17

in finding that Delaware's application sufficiently identified him as the person named in the application for requisition. The State responds that the extradition documents adequately identified him because they contained Burton's "name, date of birth, Delaware case number, social security number, 'FBI #,' and fingerprints." Again, we agree with the State.

Delaware's extradition documents provide several identifiers including Burton's height, weight, social security number, date of birth, "FBI #," Delaware case number, and fingerprints, in addition to his "other known address" at "5022 Joyner Road, Snow Hill, MD 21863," which, as explained above, is the address of the Worcester County Jail.

Burton's challenge is similar to the challenge in *Fullerton v. McCord*, 339 Ark. 45, 2 S.W.3d 775 (1999), where Fullerton asserted that the trial court erred in finding that the application for requisition adequately identified him as the wanted fugitive because the documents misspelled his name. 339 Ark. at 50, 2 S.W.3d 775. The Arkansas Supreme Court determined that the demanding state also produced Fullerton's "birth date, social security number, height," weight, and testimony from an Arkansas County Deputy, who knew the appellant prior to serving him with an arrest warrant, identifying Fullerton as the accused. *Id*. at 51, 2 S.W.3d at 779. The Arkansas Supreme Court concluded that the misspelling of Fullerton's name was a "typographical error" that did not negate the sufficiency of the extradition documents in identifying the appellant as the requested fugitive. *Id.* Burton's Wicomico County claim is nothing more than a clerical error that does not negate the sufficiency of the extradition documents identifying him as the accused.

18

Burton also challenges the circuit court's finding of a proper identification based on the failure to compare Burton's "live" fingerprints to the fingerprint card in the Delaware Attorney General's Identification Report. The State contends it did not have to conduct a "live fingerprint examination," and its failure to do so does not satisfy Burton's burden to prove beyond a reasonable doubt that he is not the accused.

In addressing this claim, the circuit court determined that "[t]here is no requirement that comparison between fingerprint cards and physical fingerprints of [Burton] be conducted . . . for identification to be appropriate. . . ." We agree. The law requires nothing more than enough evidence, which was clearly provided, to support a finding that Burton is the person sought in the application for requisition. *Bryson*, 287 Md. at 470 (citations omitted); *see also Fullerton*, 339 Ark. at 51, 2 S.W.3d at 779. We are not persuaded that the *failure* of the Maryland authorities to conduct a "live fingerprint examination" is sufficient to prove beyond a reasonable doubt that he was not the person identified in the extradition documents.

*Whether Burton is a fugitive*

Burton asserts that he is not a "fugitive from justice" because he left Delaware involuntarily as a result of the Maryland extradition proceeding. He avers that the definition of "fugitive," although not specifically defined in C.P. § 9-105(b), means and requires proof that he left Delaware voluntarily in the hope of evading justice. He contends that other articles of the Maryland Code using the term "fugitive" all illustrate the

> core principle that the person willfully absented himself from a state for the purpose of evading justice. *See* Md. Code, Pub.

19

> Safety §5-101(k) ("to avoid prosecution or giving testimony");
> Md. Code, Health Gen. §10-1301 (c)(1) ("avoiding prosecution
> or giving testimony"); Md. Code, Crim. Law [§]9-401 ("to avoid
> arrest on an outstanding warrant").

He asserts that to interpret C.P. § 9-105(b) otherwise "is unfathomable" particularly in "the very unique situation presented" in this case.

The State, on the other hand, asserts that Burton's contention runs counter to the plain meaning of C.P. § 9-105(b), which does not have a voluntariness requirement. It states:

> [t]he Governor of this State may also surrender, on demand of
> the executive authority of any other state, any person in this
> State who is charged in the manner provided in § 9-123 of this
> title with having violated the laws of the state whose executive
> authority is making the demand, *even though the person left the
> demanding state involuntarily*.

C.P. § 9-105(b) (emphasis added).

When the General Assembly adopted the Uniform Criminal Extradition Act of 1936, which included § 5 of the Uniform Criminal Extradition Act of 1936, now codified as C.P. § 9-105(b), it stated as its purpose "to make uniform the procedure on interstate extradition." 1937 Md. Laws Ch. 179. The General Assembly furthered that expressed goal by adopting § 27 of the Uniform Criminal Extradition Act of 1936, now codified as C.P. § 9-127, which states that "[t]his title shall be interpreted and construed to effectuate its general purposes to make uniform the law of those states that enact it." C.P. § 9-127. S*ee also Continental Oil Co. v. Horsey*, 177 Md. 383, 385 (1939) (discussing the general principle that "[u]niformity of Maryland decisions with those applying the same law in other states is generally to be

sought." (citing *Whitcomb v. Nat. Exchange Bank*, 123 Md. 612, 616 (1914)).

Other states adopting the Uniform Criminal Extradition Act of 1936 have distilled from it "the general rule [that] where one commits an offense in the demanding state and thereafter goes or is taken into another or asylum state, his motives in leaving or the reasons why he has left the demanding state are immaterial. . . ." *Woody v. State*, 215 Kan. 353, 363, 524 P.2d 1150, 1159 (1974) (citation omitted); *accord, e.g.*, *State v. Froelich*, 77 Wis.2d 299, 311, 253 N.W.2d 69, 75 (1977); *Application of Butler*, 346 P.2d 348, 351 (1959).[11]  This conclusion is consistent with the Commissioners' comment on § 5 of the Act, which states that "the reason for [adding] the second paragraph of [§ 5] lies in the fact that there [was] a conflict in the decisions upon the question whether a person who has been removed from a state under the compulsion of the authority of that state can be classed as a 'fugitive' from that state so that his return can be secured through extradition proceedings. . . ."  Unif. Criminal Extradition Act § 5, comment, 11 U.L.A. 291, 464 (2003).  The fact that Burton came from Delaware to Maryland involuntarily as a result of the prior extradition proceeding

---

[11]
> The mode or manner of a person's departure from the state generally does not affect his or her status as a fugitive from justice.  Thus, the fact that a person's departure is involuntary or under legal compulsion will not, according to most authority, preclude his or her extradition as a fugitive from justice, and this is so under the Uniform Criminal Extradition Act.

35 C.J.S. Extradition and Detainers § 16 (2014).

21

initiated by Maryland does not now preclude his extradition back to Delaware.

*United States Constitution and the Maryland Declaration of Rights*

Burton is less than precise in advancing his constitutional claims, but his brief, along with the record, suggests that his claims are grounded in the 5th[12], 6th[13], 8th[14], and

---

[12]    No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation.

U.S. Const. amend. V.

[13]    In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

[14] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

22

14th[15] Amendments of the United States Constitution and Articles 16,[16] 24,[17] and 25[18] of the

Maryland Declaration of Rights.  The State broadly responds to all of Burton's constitutional

claims by stating that Delaware is the appropriate forum to hear and resolve these claims.

*Reed*, 524 U.S. at 152-53.

In cases concerning similar federal and state constitutional provisions, the Court of

---

[15]      All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

[16] "That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."  Md. Const. Declaration of Rights art. 16.

[17]      That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Md. Const. Declaration of Rights art. 24.

[18] "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."  Md. Const. Declaration of Rights art. 25.

Appeals has

> often commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision.

*Griffin v. Bierman*, 403 Md. 186, 209-210 (2008) (citing *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 621[ ](2002); *but see Home Utils. Co. v. Revere Copper & Brass, Inc.*, 209 Md. 610, 614 [ ] (1956) ("[T]he decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities [regarding Article 24].")); *Oursler v. Tawes*, 178 Md. 471, 483 [ ](1940) ( "[Article 24] of the Maryland Declaration of Rights is in harmony with the 5th and 14th amendments to the Federal Constitution, and the term 'due process of law' as used in said amendments has been construed to be synonymous with the expression 'Law of the Land.'")).   Furthermore, the Court of Appeals has stated that it has "consistently construed [Articles 16, 24, and 25] as being *in pari materia* with their Federal counterparts." *See  Evans v. State*, 396 Md. 256, 327 (2006) (holding that the Court was not convinced that [Articles 16, 24, and 25] should read more broadly (or narrowly) in [the] context of a claim that "the Circuit Court for Baltimore County abused its discretion in denying, without affording discovery, [the appellant's] third motion to reopen the 1995 post conviction

proceeding in order to present the complaint that "selective prosecution by the Baltimore County State's Attorney's Office and systemic statewide racial and geographic discrimination rendered his sentence unconstitutional.").

The United States Supreme Court has stated that in an extradition proceeding,

> claims relating to what actually happened in the demanding State, the law of the demanding State, and what may be expected to happen in the demanding State when the fugitive returns are issues that must be tried in the courts of that State, and not in those of the asylum State.

*New Mexico v. Reed*, 524 U.S. 151, 153 (1998) (citations omitted). The Court of Appeals has explained that "'[s]ince the only purpose of extradition is the return of the fugitive to the place of the alleged offence, his constitutional rights, other than the present right to personal liberty are not involved.'" *Solomon,* 256 Md. at 301 (quoting *Johnson v. Warden*, 244 Md. 384, 389 (1966)).

*Sixth Amendment: Right to a Speedy Trial*

Burton's claim that Delaware incorrectly stated in its application for requisition "that no delay has occurred in the prosecution of said crime once [he] was located" is a contention that Delaware violated his right to a speedy trial under the Sixth Amendment.[19] In another extradition case where the accused asserted a Sixth Amendment claim, the Court of Appeals held that

> [t]here may be merit to the claim that [the appellant's] Sixth

---

[19] We do not understand Burton's speedy trial claim to be grounded in Article 21 of the Maryland Declaration of Rights.

25

> Amendment right to a speedy trial was infringed by the long delays in indictment and extradition; however, this is a matter for the [demanding state's] courts to determine. They will be in the best position to determine what harm, if any, was done to the appellant and will have before them the full reason for any delays. . . . We can only conclude that [the demanding state] should be the forum in which this issue concerning his right under the Sixth Amendment of the United States Constitution should be adjudicated.

*Shoemaker v. Sheriff of Carroll County*, 258 Md. 129, 131-32 (1970). Delaware is the appropriate forum to consider Burton's Sixth Amendment claim.

*Eighth Amendment, Article 16, & Article 25: Cruel and Unusual Punishment*

Burton claims that his rights under the Eighth Amendment, Article 16, and Article 25 have been violated because the death penalty is a cruel and unusual punishment. His challenge is a challenge to Delaware's death penalty law, but it is not for this Court to consider Delaware's law or "what may be expected to happen in [Delaware] when [Burton] returns." *New Mexico v. Reed*, 524 U.S. 151, 153 (1998); *see also Sweeney v. Woodall*, 344 U.S. 86, 89-90 (1952) (holding that an asylum state could not consider whether the requesting state would subject the fugitive to cruel and usual punishment under the Eighth Amendment); *In re Boynton*, 302 Mich. App. 632, 653-54, 840 N.W.2d 762, 774 (2013) (holding an Eighth Amendment and Michigan Constitutional claim against cruel and unusual punishment could not be heard by the asylum state).

Moreover, even if we could consider Burton's cruel and unusual punishment claims,

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally

26

associated with criminal prosecutions . . . . [T]he State *does not* acquire the power to punish with which the Eighth Amendment is concerned *until after* it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977) (citations omitted) (emphasis added).

Therefore, Mr. Burton's cruel and unusual punishment claims would not materialize until

*after* he has gone to trial and been sentenced. *Id.*

*Fifth Amendment, Fourteenth Amendment, & Article 24: Due Process - Vindictive*

*Prosecution*

Burton advances what we understand to be due process violation claims under the

Fifth Amendment, Fourteenth Amendment, and Article 24 of the Maryland Declaration of

Rights.

At the heart of these claims is his contention that

> the State of Maryland attempted to force [him] to forfeit his right to be tried and enter into a plea agreement whereby he would be sentenced to two life without parole sentences by threatening to have Delaware prosecute him and seek the death penalty, a penalty not available in Maryland, should he refuse. When Mr. Burton refused to give up his right to be tried and convicted, the State of Maryland made good on its threat by essentially "transferring" the case to Delaware.

He also asserts that

> [t]he record is clear that the only reason that State of Maryland had to abandon this prosecution [was] because it would not be able to legally obtain a death sentence should a conviction be

27

secured. It is clear that the respective [S]tates of Maryland and Delaware were in talks about where to try Mr. Burton. Delaware sought to charge Mr. Burton only after the death penalty was abolished in Maryland; there was no discussion about new evidence establishing that Mr. Burton committed the crime in Delaware. . . .

According to Burton, these actions demonstrate prosecutorial vindictiveness and constituted a violation of his due process rights.

We address first whether, under the facts of this case and the limited scope of habeas corpus proceedings in an extradition case, these claims are properly before us. Clearly, we should not consider any claims that require this Court to determine the motivations and actions of Delaware prosecutors in bringing charges against Burton. *Reed*, 524 U.S. at 153-154 (explaining that the actions of the demanding state are not for the asylum state to consider because "the burden on a demanding State of producing witnesses and records in the asylum State to counter allegations of [misconduct in the demanding state] would be substantial, indeed."). What will be considered, however, is the limited question of whether the actions of the Maryland prosecutor were vindictive and in violation of Burton's due process rights. *See Utt v. State*, 293 Md. 271, 273 (1982) (considering whether the appellant's Sixth Amendment right was violated when he was not afforded legal counsel in a Maryland Governor's rendition hearing).

The United States Supreme Court has held that vindictiveness by a prosecutor is a "due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (recognizing that Fourteenth Amendment due process is violated when a prosecutor

28

is vindictive); *See also United States v. Goodwin*, 457 U.S. 368, 372(1982) (recognizing that Fifth Amendment due process is violated when a prosecutor is vindictive).

Prosecutorial vindictiveness jurisprudence indicates that a defendant can meet his or her burden in a prosecutorial vindictiveness claim by showing circumstances that "pose a realistic likelihood of 'vindictiveness,'" warranting a presumption of prosecutorial vindictiveness. *Blackledge v. Perry*, 417 U.S. 21, 27 (1974); *accord, e.g.*, *Thigpen v. Roberts*, 468 U.S. 27 (1984). The burden then shifts to the government to rebut that presumption by justifying its actions toward the defendant. If the prosecution fails to do so, prosecutorial vindictiveness has been shown. *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001).

In *Bordenkircher v. Haynes*, the United States Supreme Court held that a defendant could also prove prosecutorial vindictiveness by presenting objective and direct evidence of *actual* vindictiveness. 434 U.S. 357 The *Bordenkircher* Court addressed a prosecutorial vindictiveness claim in a pretrial setting. *Id.* at 358. The state prosecutor in *Bordenkircher* told that defendant that if he chose to not plead guilty to "uttering a forged instrument . . . an offense then punishable by a term of 2 to 10 years in prison," he would also be indicted on charges under the "Habitual Criminal Act," which carried "a mandatory sentence of life imprisonment by reason of his two prior felony convictions." *Id.* at 358-59. The Supreme Court began its analysis by distinguishing prosecutorial vindictiveness in a post-trial setting from a pretrial setting, stating,

29

[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional. But in the "give-and-take" of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.

Plea bargaining flows from the mutuality of advantage to defendants and prosecutors, each with his own reasons for wanting to avoid trial. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial.

*Bordenkircher*, 434 U.S. at 363-64 (internal quotations and citations omitted).[20]  The

---

[20] The value and importance of plea bargaining has also been recognized by the Court of Appeals:

It is well documented that plea bargains play a crucial role in the system of criminal justice in Maryland and throughout the United States. In addition to relieving over-burdened courts, the termination of charges following plea negotiations:

[ ]leads to [the] prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be

30

Supreme Court ultimately found that

> [t]o hold that the prosecutor's desire to induce a guilty plea is an "unjustifiable standard," which, like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself. Moreover, a rigid constitutional rule that would prohibit a prosecutor from acting forthrightly in his dealings with the defense could only invite unhealthy subterfuge that would drive the practice of plea bargaining back into the shadows from which it has so recently emerged.

*Id.* at 364-65 (citing *Blackledge v. Allison*, 431 U.S. 63, 76 (1977)). The Supreme Court stressed that it was only holding that "the prosecutor *in this case*, which no more than openly presented the defendant with unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate" the Fourteenth Amendment. *Id.* at 365 (emphasis added). In *United States v. Goodwin*, the Supreme Court addressed whether the presumption of prosecutorial vindictiveness could be "applied to evaluate a prosecutor's pretrial response to a defendant's demand for a jury trial." 457 U.S. 368, 367

---

> the rehabilitative prospects of the guilty when they are ultimately imprisoned.[ ]
>
> *State v. Brockman*, 277 Md. 687, 693 (1976) (quoting *Santobello v. New York*, 404 U.S. 257, 261 (1971)). Plea agreements, moreover, "eliminate many of the risks, uncertainties and practical burdens of trial, permit the judiciary and prosecution to concentrate their resources on those cases in which they are most needed, and further law enforcement by permitting the State to exchange leniency for information and assistance." *Brockman*, 277 Md. at 693, 357 A.2d at 381. For these reasons, "plea bargains, when properly utilized, aid the administration of justice and, within reason, should be encouraged." *Id.*[ ]357 A.2d at 381.

*Cuffley v. State*, 416 Md. 568, 577 (2010).

31

(1982).  The defendant in *Goodwin* contended that after he exercised his right to demand a jury trial for a  misdemeanor charge, the prosecutor also indicted the defendant for "a felony charge," which according to the defendant, warranted a presumption of prosecutorial vindictiveness. *Id.* at 370.  The Supreme Court stated that

> [t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized.
>
> * * *
>
> A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.

*Id.* at 381-82.  The *Goodwin* Court explained that the reasons for creating a presumption of prosecutorial vindictiveness in a post-trial setting were less persuasive in a pretrial setting because of the inherent unpredictability of pretrial proceedings. *Id.*  The Court again limited its holding to the specific facts of the case and did "not foreclose the possibility that a defendant in an appropriate case might prove objectively that a prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do."  *Id.* at 384.

Since these Supreme Court decisions, the case by case approach has rendered prosecutorial vindictiveness jurisprudence, as one court put it, "complicated."  *Wilson*, 262

32

F.3d at 314. Currently, prosecutorial vindictiveness jurisprudence indicates that a defendant can demonstrate a prosecutorial vindictiveness claim through (1) objective and direct evidence of actual vindictiveness or (2) circumstantial evidence that warrants a presumption of vindictiveness. *Id.* The presumption of prosecutorial vindictiveness, however, is not likely, if ever, to take root in a pretrial setting. *Id.* at 315 (citing *Goodwin*, 457 U.S. at 381).

Burton does not expressly argue that the circumstances surrounding the State's decision not to prosecute in Maryland warrants a presumption of prosecutorial vindictiveness. We recognize, however, that the circumstances surrounding the State's decision not to prosecute and most especially, the lack of a death penalty in Maryland as there is in Delaware, is a significant backdrop to his vindictive prosecution argument. Therefore, with that in mind, possibly, we turn to whether he has demonstrated actual vindictiveness through direct and objective evidence that the prosecutors action's were not lawful, and were solely motivated "by a desire to punish [him] for doing something that the law plainly allowed him to do." *Goodwin*, 457 U.S. at 384; *Wilson*, 262 F.3d at 315 (stating that courts must "be cautious not to intrude unduly in the broad discretion given to prosecutors in making charging decisions. Indeed, a prosecutor's charging decision is presumptively lawful.").

In reviewing Burton's Brief along with the record, it appears that, Burton is claiming that the Maryland prosecutor dropped the Maryland charges because he refused to accept the plea deal. What pervades Burton's argument is the possibility that if he were tried in

Delaware he could receive the death penalty, and that the prosecutors were working together

to achieve a plea. But, as we see it, the Maryland prosecutor was simply informing Burton

and his counsel that if he did not accept the plea offer, Maryland would drop the pending

charges and "any prosecution by Delaware would supersede the current criminal case in

Maryland." The Maryland prosecutor attached the letter from Delaware prosecutors, which

expressed their interest in charging Burton in Delaware and seeking the death penalty. The

letter articulated the Delaware prosecutors' general theory on the murder and rape of Mrs.

Bennett. Burton was aware of these alternatives when he made his decision. Like the

prosecutor in *Bordenkircher*, the Maryland prosecutor merely "openly presented [Burton]

with the unpleasant alternatives of forgoing charges on which he was plainly subject to

prosecution." *Bordenkircher*, 434 U.S. at 365. The presentation of an alternative does not

rise to a due process violation.[21] *Id.*

This case differs from *Bordenkircher* in that the prosecutor did not increase charges

and did not even proceed with prosecution, but this distinction does not negate the fact that

*Bordenkircher's* instructive value. Other courts presented with similar situations, have

considered whether a state prosecutor has acted with actual vindictiveness when the state

prosecutor drops state charges to allow a federal indictment after a defendant has refused to

---

[21] We also recognize that a prosecutor faced with a homicide involving multiple states has the task of determining and proving whether his or her state has territorial jurisdiction. *State v. Bulter*, 353 Md. 67, 72-73 (1999). In Maryland, the prosecutor would not only have to convince a jury beyond a reasonable doubt that the defendant committed the crime, but also prove beyond a reasonable doubt that the crime was committed in Maryland. *Id.* at 79.

34

plead guilty to those state charges and have not found prosecutorial vindictiveness. *See, e.g.*, *United States v. Williams*, 47 F.3d 658, 662-63 (4th 1995) (holding that a state prosecutor carrying out a threat to drop a case so federal prosecutors could impose a harsher sentence was not actually vindictive); *United States v. Allen*, 954 F.2d 1160, 1166 (6th Cir. 1992) (holding that a state prosecutor was not actually vindictive when the state prosecutor referred the defendant's case to federal prosecutors because the federal offense carried a stiffer penalty); *United States v. Gray*, 382 F. Supp. 2d 898, 907 (E.D. Mich. 2005) (discussing multiple federal circuit court decisions that did not find actual vindictiveness in a pretrial setting). We too are not persuaded that the Maryland prosecutor's actions demonstrate actual vindictiveness, and did not violate Burton's due process rights.

*Fifth Amendment, Fourteenth Amendment, & Article 24: Due Process - Governor's*

*Warrant of Rendition*

Burton also contends that Maryland violated his due process rights by issuing the Governor's Warrant of Rendition. Burton seemingly ignores that fact that the United States Constitution and C.P. § 9-102 mandate the Governor comply with interstate extradition requests. *See Puerto Rico v. Branstad*, 483 U.S. 219, 227 (1987) ("the commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or the courts of the asylum State." (citation omitted)); C.P. § 9-102 ("[I]t is the duty of the Governor of this State to have arrested and delivered up to the executive authority of any other state any person charged in that state with treason, felony, or other crime, who has fled

from justice and is found in this State.").

**JUDGMENT AFFIRMED.**
**COSTS TO BE PAID BY APPELLANT**.